731 F.2d 112
 AARON FERER & SONS LIMITED, Plaintiff-Appellant,
v.
The CHASE MANHATTAN BANK, NATIONAL ASSOCIATION, Defendant-Appellee.
WILLIAMS & GLYN'S BANK LIMITED, Plaintiff-Appellant,
v.
The CHASE MANHATTAN BANK, NATIONAL ASSOCIATION, Defendant-Appellee.
 Nos. 280, 281, Dockets 83-7420, 83-7424.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 31, 1983.
Decided March 14, 1984.
 
 Ludwig A. Saskor, New York City (Smith, Steibel, Alexander & Saskor, P.C., George M. Donaldson, Mary G.B. Boney, New York City, of counsel), for plaintiffs-appellants.
 Andrew J. Connick, New York City (Milbank, Tweed, Hadley & McCloy, John C. Maloney, Jr., John B. Madden, Jr., New York City, of counsel), for defendant-appellee.
 Before FEINBERG, Chief Judge, and NEWMAN and PRATT, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Plaintiffs, Williams & Glyn's Bank, Ltd. (Williams & Glyn's) and Aaron Ferer & Sons, Ltd. (Ferer-London), appeal from a judgment of the United States District Court for the Southern District of New York, Honorable Thomas P. Griesa, Judge, entered after a jury trial, dismissing their joint actions against defendant, The Chase Manhattan Bank (Chase). Williams & Glyn's and Ferer-London sued Chase for money had and received, breach of fiduciary duty, negligence, misrepresentation, and for rescission of releases exchanged between Chase and Williams & Glyn's. Plaintiffs alleged that money lent by Williams & Glyn's to Ferer-London had been converted by Ferer-London's American parent corporation, Aaron Ferer & Sons Co. (Ferer-Omaha), which had used the money to repay loans owing to Chase, and that Chase knew the money actually belonged to plaintiffs. At the close of evidence the trial court directed a verdict in Chase's favor on the breach of fiduciary duty and negligence counts. Thereafter, the court set aside the jury's special verdicts, which found that Chase had misrepresented or concealed material facts connected with the release, and instead held that the release was not tainted with fraud, was valid, and barred Williams & Glyn's entire action. Finally, the trial court determined that Ferer-London failed to prove its count for money had and received, and it dismissed both complaints. We affirm.
 
 I. BACKGROUND
 
 2
 Before addressing the legal issues, we must undertake a detailed review of the essential facts. Ferer-Omaha is a Nebraska corporation that bought and sold metal both in the United States and abroad. Defendant Chase Manhattan Bank is a national bank with offices in New York and London. Chase provided much of the financing for Ferer-Omaha's operations, and had a perfected security interest in all of Ferer-Omaha's property.
 
 
 3
 Plaintiff Ferer-London is an English corporation and a wholly owned subsidiary of Ferer-Omaha. Ferer-London was also engaged in the metal trading business. Ferer-London's purchases were financed in part by Chase, and in part by plaintiff Williams & Glyn's, an English bank with offices in London and New York.
 
 
 4
 A. Chase's Credit Arrangement with Ferer-Omaha
 
 
 5
 In April 1970 Ferer-Omaha entered into a credit and security agreement with Chase and the United States National Bank of Omaha (USNB), a local bank acting as agent for Chase. Chase perfected its security interest in Ferer-Omaha's property by filing financing statements in Nebraska, New York, and other jurisdictions where Ferer-Omaha did business. Chase and USNB provided Ferer-Omaha with a revolving line of credit which permitted Ferer-Omaha to borrow up to $5 million determined by a "borrowing base" formula. The borrowing base consisted of 90% of Ferer-Omaha's accounts receivable and an allowance of $1 million for inventory. In exchange, Ferer-Omaha agreed to assign its accounts receivable directly to Chase. Assignments and copies of the invoices representing the amounts due on the accounts were sent weekly to Chase.
 
 
 6
 Chase's control over the accounts receivable assigned to it was achieved through the use of a "lock box", which was really nothing more than a post office box in Chase's name. Ferer-Omaha's invoices bore a legend that requested its customers to remit payment directly to the lock box in New York City. Use of the lock box insured that Chase and USNB retained control over the receivables and also served to expedite receipt and recordation of payments. Chase collected checks from the lock box and deposited them into a cash collateral account maintained by it for Ferer-Omaha. While the funds in the cash collateral account belonged to Ferer-Omaha, transfers from that account were controlled by Chase pursuant to the borrowing base formula. If there was insufficient collateral to support the debt owed to Chase, it had the option of applying funds from the cash collateral account to reduce the loans in accordance with the credit and security agreement. The evidence showed, however, that the funds received in the cash collateral account were usually transferred immediately to Ferer-Omaha's operating account.
 
 
 7
 B. Course of Dealing Between Ferer-Omaha and Ferer-London
 
 
 8
 In late 1970 Ferer-Omaha's president, Harvey Ferer, formed an English subsidiary, Ferer-London, to assist Ferer-Omaha in the metal trading business. Harvey Ferer also planned to use Ferer-London to trade in metal futures contracts on the London Metal Exchange (LME). Chase extended a small line of credit to Ferer-London, and financed specific copper purchases by Ferer-London on a transaction-by-transaction basis.
 
 
 9
 The usual operating arrangement between Ferer-Omaha and Ferer-London was that the copper purchased by Ferer-London would be transferred to Ferer-Omaha for refining and sale to end users. Ferer-Omaha paid for the shipping and refining, and determined the selling price of the copper. After receipt of the sales proceeds, Ferer-Omaha would be reimbursed for its expenses, Ferer-London would be repaid the original purchase price, and any profit would then be divided between parent and subsidiary. The arrangement between the companies was never set out in writing.
 
 
 10
 Ferer-Omaha usually invoiced its sales of Ferer-London's copper on Ferer-London invoices. Although Ferer-London's invoices did not bear the legend directing payment to the Chase lock box, most of the purchasers of the Ferer-London copper through Ferer-Omaha followed their customary practice and sent payments there anyway. The funds would pass through the collateral account, into the operating account, and Ferer-Omaha would then repay Ferer-London from that account.
 
 C. The Codelco Copper
 
 11
 In 1973 Harvey Ferer, acting for Ferer-Omaha, contracted with Corporacion del Cobre (Codelco) in Chile for the monthly purchase of partially refined copper. Ferer-Omaha did not have sufficient credit at Chase to purchase all of the copper it contracted for, so at Harvey Ferer's request, Ferer-London purchased some of the monthly shipments. Two Ferer-London purchases from Codelco were financed by Chase.
 
 
 12
 In August 1973 Williams & Glyn's began financing Ferer-London's purchases of copper from Codelco. The terms of the loans from Williams & Glyn's to Ferer-London were not reduced to writing anywhere other than in the credit applications Ferer-London filed to procure letters of credit from Williams & Glyn's. With respect to the Codelco copper Williams & Glyn's never filed a financing statement, security agreement, or any other document to perfect a lien in England or in any jurisdiction in the United States until after most of the Codelco copper had been sold.
 
 
 13
 At first Codelco did not realize that it was dealing with both Ferer-Omaha and Ferer-London as buyers. Consequently, some of the earlier contracts mistakenly named Ferer-Omaha as buyer, when in fact, Ferer-London was the buyer. Ferer-Omaha returned the contracts, and Codelco changed most of them to show Ferer-London as buyer. Codelco's invoices listed the buyer's name, address, Codelco contract number, and a letter of credit number. The invoices also showed the name of the vessel the copper was to be shipped on, the date and place of shipping, and the destination.
 
 
 14
 Both Ferer-Omaha's and Ferer-London's purchases of Codelco copper were invoiced on a provisional basis, based on an estimated copper content. Following assay, a final invoice was issued. If the final invoice was lower than the provisional invoice, then Codelco owed a refund for overpayment; conversely, if the final invoice was higher than the provisional invoice, then a balance was due from the buyer.
 
 
 15
 When the ships bearing Codelco copper reached the United States, Ferer-Omaha performed its usual services by arranging for further refining and sale. However, instead of invoicing the sales of Ferer-London's refined Codelco copper on Ferer-London's invoices, as had been its prior practice, Ferer-Omaha invoiced the Codelco copper sales on its own forms and assigned the invoices to Chase. Notwithstanding those assignments, however, until March 1974 Ferer-Omaha was diligent in sending Ferer-London sufficient funds to enable Ferer-London to repay the loans it owed to Williams & Glyn's.
 
 D. The Crisis
 
 16
 Serious delays in payments from Ferer-Omaha to Ferer-London on Codelco copper sales began in March 1974. On April 20, 1974, two Ferer-London directors flew to Omaha and met with Harvey Ferer seeking to accelerate payments. During the course of the meeting Harvey Ferer revealed that he had diverted $12 million of Ferer-London's Codelco proceeds to pay LME margin calls. The Ferer-London directors returned to London and informed Williams & Glyn's of Ferer-Omaha's problems. They also told Williams & Glyn's that Chase had a security interest or "charge" over all of Ferer-Omaha's receivables.
 
 
 17
 Two days later, on April 22, 1974, Harvey Ferer told Chase officials about the potential loss of $25 million because of his speculation on the LME. He also told Chase representatives that Ferer-London owed $12 million to Williams & Glyn's that could not be repaid because the funds had been diverted to pay margin calls on the LME. That same day, Chase made a formal demand on Ferer-Omaha for repayment of its loans. On April 24 Ferer-Omaha filed a Chapter XI petition in the bankruptcy court in Omaha. A few months later Ferer-London went into liquidation in England.
 
 
 18
 As part of the effort to collect its outstanding loans, Williams & Glyn's had Ferer-London assign its interest in those Codelco copper shipments that corresponded to unpaid letters of credit. Using the assignments, Williams & Glyn's was able to take possession of several shipments and thereby reduce its losses to approximately $7.7 million. Williams & Glyn's and Ferer-London then proceeded to the bankruptcy court in Nebraska to determine what would be available for them from Ferer-Omaha.
 
 E. The Omaha Bankruptcy Proceedings
 
 19
 As part of the bankruptcy proceedings in Omaha, and with the approval of the bankruptcy court, Chase continued to finance Ferer-Omaha at vastly reduced levels. This enabled Ferer-Omaha to continue operating its metals trading business under the supervision of the bankruptcy court. While the court specifically approved use of the "lock box" system, it maintained summary jurisdiction over the funds being transferred into and out of the collateral account.
 
 
 20
 From 1974 until early 1977 Williams & Glyn's was represented in the Ferer-Omaha bankruptcy proceedings by Carter, Ledyard & Milburn (Carter Ledyard), a New York law firm. Carter Ledyard reported to Williams & Glyn's London solicitors, and in turn retained Kennedy, Holland, DeLacey & Svoboda (Kennedy Holland) as local counsel in Omaha. In late 1975 Ferer-London also retained Carter Ledyard and Kennedy Holland.
 
 
 21
 In May 1974 Williams & Glyn's and Ferer-London brought reclamation actions against Ferer-Omaha in the bankruptcy court. Williams & Glyn's claimed that Ferer-Omaha had converted approximately $9 million that should have been turned over to Ferer-London for repayment to Williams & Glyn's. Ferer-London's original claim was for approximately $10 million, but because $9 million of that claim was represented by amounts assigned to Williams & Glyn's, Ferer-London voluntarily reduced its claim to approximately $1 million. Ferer-London joined Williams & Glyn's in seeking to enjoin Ferer-Omaha from disposing of Ferer-London's Codelco copper or proceeds. Chase moved to intervene, claiming that it had a perfected security interest in all of Ferer-Omaha's property.
 
 
 22
 The bankruptcy court entered a temporary restraining order directing Ferer-Omaha to furnish a summary of all transactions relating to the disposition of the Codelco copper. Ferer-Omaha's summary stated that all of the accounts receivable had been paid, but did not show that the funds had passed through the collateral account at Chase. Williams & Glyn's then sought to withdraw its reclamation action without prejudice. Chase did not oppose the withdrawal motion, but sought to have attorneys' fees assessed against Williams & Glyn's if the withdrawal motion was granted.
 
 
 23
 During the course of oral argument on the withdrawal motion, counsel for Williams & Glyn's attempted to characterize his client as the innocent party in all of the bankruptcy proceedings and argued that attorneys' fees should not be awarded. Counsel for Williams & Glyn's argued that a good deal of Ferer-London proceeds owed to Williams & Glyn's "directly or indirectly, went to Chase Manhattan Bank * * *". Thus, both Williams & Glyn's and Ferer-London knew, or at least suspected, as early as July 1974, that Chase was the recipient of the money which Williams & Glyn's claimed. The bankruptcy court granted Williams & Glyn's motion to withdraw and denied Chase's motion for attorneys' fees.
 
 1. The Codelco Refunds
 
 24
 Because the final assay of copper content in the Codelco shipments proved to be lower than the provisional assays, Ferer-Omaha and Ferer-London were due refunds for overage payments on most of the copper purchased from Codelco (hereinafter "Codelco refunds"). On May 7, 1975, Harvey Ferer furnished Chase with a handwritten schedule of Codelco contracts, stating whether the contract was in Ferer-Omaha's or Ferer-London's name, the amounts due or owing, and the financing bank.
 
 
 25
 On May 30, 1975, Codelco paid Chase approximately $505,000 in Codelco refunds. Two weeks later, Codelco sent approximately $17,000 more, for a total of $522,000. Chase, believing that its security interest gave it a superior right to the refunds, applied them to Ferer-Omaha's outstanding pre-bankruptcy loans.
 
 
 26
 Williams & Glyn's was aware that Chase claimed the refunds on account of the Ferer-Omaha and Ferer-London purchases financed by Chase. In a phone conversation in May 1975, Chase's attorney told James Gadsden, an attorney for Williams & Glyn's, that Chase had received refunds from Codelco and that Chase believed that it was entitled to keep them because of its security interest in all of Ferer-Omaha's property. At the same time, Ferer-Omaha furnished Williams & Glyn's with a schedule of amounts due from Codelco which contained exactly the same information, in typewritten form, that had been furnished to Chase by Harvey Ferer. The schedule furnished to Williams & Glyn's even had footnotes to show which Ferer-London shipments Chase claimed, some of which included shipments financed by Williams & Glyn's. Gadsden related this information to the London attorneys for the bank, and furnished them with the schedule showing the amounts due. At that time no one objected to Chase's retention of the Codelco refunds.
 
 
 27
 2. The Confirmed Plan of Arrangement and Exchange of Releases
 
 
 28
 In 1975 Chase and the other creditors of Ferer-Omaha sought to work out a reorganization plan so that Ferer-Omaha could emerge from the bankruptcy proceedings. The problem facing the creditors and the debtor, however, was the existence of the potential Williams & Glyn's/Ferer-London claim of approximately $9-10 million. The validity of Ferer-London's and Williams & Glyn's claims had been disputed at many creditors' meetings, but in the summer of 1975 a compromise began to emerge.
 
 
 29
 That compromise was embodied in a stipulation filed in the bankruptcy court on May 21, 1975, and in releases exchanged between Chase and Williams & Glyn's in September 1975. The stipulation entered into between Williams & Glyn's, Ferer-London, and Ferer-Omaha, provided that Ferer-Omaha, although denying any intent to commit any wrongdoing, had technically "converted" Ferer-London copper financed by Williams & Glyn's. Therefore, the stipulation proved Williams & Glyn's unsecured claim for $9 million in the bankruptcy proceedings. The stipulation also stated that Williams & Glyn's was holding $358,000 that belonged to Ferer-Omaha, which both Chase and Williams & Glyn's claimed. The stipulation allowed Williams & Glyn's to keep the $358,000 and set it off against their bankruptcy claim. Finally, the stipulation provided that Williams & Glyn's would drop its non-dischargeability complaint filed in May 1975 so that a plan of arrangement could be worked out.
 
 
 30
 In return for dropping its objections to the claims of Williams & Glyn's, and consenting to the set off of the $358,000, Chase obtained a release from Williams & Glyn's in which Williams & Glyn's released all claims
 
 
 31
 which it ever had, now has or which it or its successors hereafter can, shall or may have against The Chase Manhattan Bank, N.A. or against The United States National Bank of Omaha, for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents, arising out of any transactions or occurrences involving Williams & Glyn's Bank Ltd. and Aaron Ferer & Sons Co., a Nebraska corporation, or Aaron Ferer & Sons Ltd., a United Kingdom corporation, or any transactions or occurrences involving The Chase Manhattan Bank, N.A. and/or The United States National Bank of Omaha and Aaron Ferer & Sons Co. or Aaron Ferer & Sons Ltd.; * * *.
 
 
 32
 Relying in part on the stipulation, the bankruptcy court, on September 8, 1975, confirmed a plan of arrangement for Ferer-Omaha that permitted Williams & Glyn's to participate as an unsecured creditor of Ferer-Omaha to the full extent of its $9 million claim.
 
 II. THE PRESENT ACTIONS
 
 33
 In May 1977 Williams & Glyn's and Ferer-London learned that the Codelco refunds paid to Chase amounted to $522,000. Ferer-London's liquidator protested, claiming that Chase was not entitled to those funds and demanding that Chase remit them to Ferer-London. When Chase refused, plaintiffs instituted these joint actions in the New York Supreme Court in August 1977. Because international banking transactions were involved, Chase removed the actions to the federal district court pursuant to 12 U.S.C. Sec. 632 (1982).
 
 
 34
 Plaintiffs' amended complaints sought damages for money had and received, negligence, breach of fiduciary duty, and misrepresentation. Additionally, Williams & Glyn's sought rescission of the 1975 release because of alleged misrepresentations by Chase.
 
 
 35
 In 1979 Chase sought discovery of all Carter Ledyard and Kennedy Holland memoranda, contending that the misrepresentation count raised an issue of Williams & Glyn's knowledge at the time the releases were exchanged. Chase also sought discovery of all correspondence between the law firms and Williams & Glyn's. The district court granted Chase's motion, but excluded from the discovery any portion of the memoranda or correspondence that contained instructions and information from Williams & Glyn's. We see no error in the district court's resolution of this discovery problem.
 
 
 36
 In April 1980 Chase moved for summary judgment on the ground that plaintiffs' claims were barred by the amended plan of arrangement in the bankruptcy proceedings. Chase argued that plaintiffs were aware of their potential claims in the bankruptcy proceedings, that plaintiffs had participated in those proceedings, and that all claims were, or should have been, litigated in the bankruptcy court. Judge Griesa granted partial summary judgment, holding that:
 
 
 37
 Those issues, the property, the receivables of Ferer-Omaha were within the jurisdiction of the bankruptcy court. Ferer-London and Williams & Glyn's were out there claiming conversion. The bankruptcy action clearly embraces or clearly embraced and bars now further litigation about claims by plaintiffs here against Chase arising from the post-April 24, 1974 matters.
 
 
 38
 A jury trial on the remaining issues began on March 24, 1983, and continued until April 18, 1983. At the close of all the evidence, Judge Griesa dismissed the negligence and breach of fiduciary duty counts, holding that plaintiffs' negligence actions were barred by New York's three-year statute of limitations, and that, as a matter of law, plaintiffs had failed to prove that Chase owed a fiduciary duty to either plaintiff.
 
 
 39
 The court then submitted four questions to the jury in the form of special verdicts. The first two questions asked about Chase's knowledge of Ferer-London's ownership interest or Williams & Glyn's security interest in the Codelco copper. The jury found that Chase had no actual knowledge of either interest. On questions 3 and 4, which related to the release, the jury found that Chase had misrepresented or concealed material facts connected with the release and that Williams & Glyn's had relied on that misrepresentation or concealment.
 
 
 40
 Chase moved to set aside the affirmative responses to the release questions and for judgment n.o.v. The court granted Chase's motion, stating:
 
 
 41
 Williams & Glyn's was represented by counsel both in New York and in Omaha. Williams & Glyn's had all the rights of the American litigation process available to it before it signed any release. Aside from that, the record is absolutely conclusive that Williams & Glyn's knew, and Ferer-London knew, the nature of their claims against Chase. The documents are absolutely conclusive on that.
 
 
 42
 The district court therefore ruled that the release was valid and that it barred Williams & Glyn's entire action.
 
 
 43
 Turning to Ferer-London's only remaining cause of action--money had and received--Judge Griesa held that (1) Chase was a "good faith purchaser" under Article 2 of the Uniform Commercial Code; (2) Ferer-London never attempted to show that any of its money could be traced to Chase; and (3) equity did not require that Chase bear the loss suffered by Ferer-London. On April 27, 1983, judgment was entered dismissing both plaintiffs' complaints.
 
 III. DISCUSSION
 
 44
 Before taking up the specific claims on appeal, we need to consider the controlling law and the proper standard of review. It is apparent from the factual picture painted above that the events leading to this litigation cut across the boundaries of two foreign nations, England and Chile, and at least two states within the United States, New York and Nebraska. Inexplicably, none of the parties have attempted to show which forum's law should govern these actions. Instead, both sides have drawn from a potpourri of decisions from the jurisdictions connected with the events in question, concentrating, however, on New York law.
 
 
 45
 These actions were removed to the district court under the Edge Act, 12 U.S.C. Sec. 632 (1982), which provides:
 
 
 46
 [A]ll suits of a civil nature at common law or in equity [involving a United States corporation], arising out of transactions involving international or foreign banking, * * * shall be deemed to arise under the laws of the United States, * * * [and may be removed] into the district court * * *.
 
 
 47
 The fact that this action "arises under the laws of the United States", however, does not necessarily mean that federal law supplies the ultimate rule of decision. See United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). Believing that this type of controversy, like that in Kimbell Foods, does not require a uniform federal rule, and applying the federal common law choice of law approach set out by Judge Lumbard in Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786 (2d Cir.1980), cert. denied, 449 U.S. 1111, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981), we conclude that New York law governs plaintiffs' complaints.
 
 
 48
 In Corporacion Venezolana de Fomento, Judge Lumbard separated the issues to determine which forum's law would apply to each. Id. at 794; see also Pearson v. Northeast Airlines, Inc., 309 F.2d 553 (2d Cir.1962) (en banc ), cert. denied, 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963). The case at bar involves two different types of issues: restitution (money had and received) and tort (negligence, breach of fiduciary duty, and misrepresentation).
 
 
 49
 As to the action for money had and received, New York law governs. The banking relationship between Ferer-Omaha and Chase arose in New York, the banking transactions were carried out in New York, Chase's principal offices are located in New York, Williams & Glyn's has an office there, and Chase received plaintiffs' money, if at all, through the lock box and collateral account in New York. See Restatement (Second) Conflict of Laws Sec. 221 (1971); Industrial Export & Import Corp. v. HongKong & Shanghai Banking Corp., 191 Misc. 493, 77 N.Y.S.2d 541 (N.Y.Sup.Ct.1947), aff'd, 302 N.Y. 342, 98 N.E.2d 466 (1951); see also Ehrenzweig, Restitution in the Conflict of Laws, 36 N.Y.U.L. Rev. 1298, 1305-07 (1961) (law of forum usual rule in restitutionary actions). Additionally, New York has a significant interest in regulating banking practices occurring within its borders.
 
 
 50
 New York also has the superior interest in having its law applied to the negligence, breach of fiduciary duty, and misrepresentation issues. All of the acts which plaintiffs complain of took place in New York, see Neumeier v. Kuehner, 31 N.Y.2d 121, 128-29, 335 N.Y.S.2d 64, 69-70, 286 N.E.2d 454, 457-58 (1972), and New York certainly has a substantial interest in preventing torts by banks operating within its jurisdiction.
 
 
 51
 Finally, the parties have not attempted to show that the law of any other potentially interested jurisdiction differs from that of New York. See Cousins v. Instrument Flyers, Inc., 44 N.Y.2d 698, 405 N.Y.S.2d 441, 376 N.E.2d 914 (1978). We therefore conclude that New York law governs the substantive issues raised on these appeals.
 
 
 52
 The standard of review governing plaintiffs' appeals is the same for the causes of actions dismissed on directed verdict--negligence, breach of fiduciary duty, and money had and received--as it is for the misrepresentation cause of action dismissed by judgment n.o.v. See Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163 (2d Cir.1980); O'Connor v. Pennsylvania Railroad Co., 308 F.2d 911, 914 (2d Cir.1962). Moreover, the test to be applied by the court of appeals is the same as that originally applied by the trial judge. O'Connor v. Pennsylvania Railroad Co., 308 F.2d at 914. Specifically,
 
 
 53
 [T]he trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. [or directed verdict only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.
 
 
 54
 Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d at 167-68.
 
 
 55
 We now turn to an analysis of each of plaintiffs' causes of action.
 
 A. Negligence
 
 56
 Plaintiffs alleged that Chase was negligent, indeed grossly negligent, because it accepted Ferer-London's proceeds from Ferer-Omaha, and because it allowed Ferer-Omaha to borrow money while speculating on the LME. Plaintiffs allege that these actions continued until April 1974. Whatever their merits, plaintiffs' claims for negligence and gross negligence are barred by New York's three-year statute of limitations. See N.Y.Civ.Prac. Law Sec. 214(4) (McKinney 1972). Since the acts complained of ceased in April 1974 and plaintiffs' actions in state court were not begun until August 1977, the district court's dismissal of plaintiffs' claim for negligence and gross negligence was proper.
 
 B. Breach of Fiduciary Duty
 
 57
 Plaintiffs contend that by accepting the funds in the lock box and by accepting the Codelco refunds, Chase has breached a "fiduciary duty" owing to each plaintiff. The weakness in this claim, however, is that neither Williams & Glyn's nor Ferer-London established that Chase owed them a fiduciary duty.
 
 
 58
 Williams & Glyn's maintains that the long-standing correspondent bank relationship between it and Chase created a fiduciary relationship between the banks. This is not so. A correspondent bank relationship, standing alone, does not create an agency relationship, see Amigo Foods Corp. v. Marine Midland Bank--New York, 39 N.Y.2d 391, 384 N.Y.S.2d 124, 348 N.E.2d 581 (1976), and Williams & Glyn's neither pleaded nor proved any other facts which could possibly be construed as creating a fiduciary relationship between it and Chase.
 
 
 59
 Ferer-London claims that Chase owed it a fiduciary duty because Chase (1) was banker for both Ferer-Omaha and Ferer-London; (2) had access to the financial records of both corporations; and (3) knew that the two corporations had a "close relationship". Notwithstanding Ferer-London's allegations, New York law is clear that the usual relationship of bank and customer is that of debtor and creditor. Solicitor for the Affairs of His Majesty's Treasury v. Bankers Trust Co., 304 N.Y. 282, 107 N.E.2d 448 (1952); see also Industrial Commissioner v. Five Corners Tavern, Inc., 47 N.Y.2d 639, 643, 419 N.Y.S.2d 931, 934, 393 N.E.2d 1005, 1009 (1979). And in this case, there is no evidence to indicate that either Chase or Ferer-London intended that their relationship be something more than just the debtor-creditor relationship. Cf. National Boulevard Bank of Chicago v. Schwartz, 175 F.Supp. 74, 76-77 (S.D.N.Y.1959), aff'd, 274 F.2d 823 (2d Cir.1960).
 
 
 60
 C. Misrepresentation and Rescission of the 1975 Release
 
 
 61
 Plaintiffs' amended complaints alleged that Chase misrepresented and concealed material facts with regard to its credit arrangement with Ferer-Omaha and its receipt of Codelco refunds. Plaintiffs further alleged that they were entitled to money damages because they chose to forgo certain collection procedures in the Omaha bankruptcy action in reliance on the facts as Chase misrepresented them. Additionally, Williams & Glyn's sought rescission of the release it had given Chase in September 1975, contending the release would not have been given had Williams & Glyn's known the true facts.
 
 1. Validity of the Release
 
 62
 Although plaintiffs alleged that Chase both misrepresented and concealed material facts, the evidence introduced at trial related only to concealment. Under New York law, omissions of material fact may rise to a level constituting fraud and serve as a basis for an action for money damages, Goldsmith v. National Container, Inc., 287 N.Y. 438, 40 N.E.2d 242 (1942); or for rescission of a release. Dambmann v. Schulting, 75 N.Y. 55 (1878); Gurnee v. Hasbrouck, 267 N.Y. 57, 195 N.E. 683 (1935). Before such omissions can be labelled fraudulent, however, there must be a showing that a duty of disclosure existed. Frigitemp Corp. v. Financial Dynamics Fund, Inc., 524 F.2d 275 (2d Cir.1975); Gurnee v. Hasbrouck, 267 N.Y. at 62, 115 N.E. at 692.
 
 
 63
 During the course of negotiations surrounding a business transaction, a duty to disclose may arise in two situations: first, where the parties enjoy a fiduciary relationship, see Frigitemp Corp. v. Financial Dynamics Funds, Inc., 524 F.2d at 283; see also Coface v. Optique Du Monde, Ltd., 521 F.Supp. 500, 504 (S.D.N.Y.1980); and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. See Frigitemp Corp. v. Financial Dynamic Funds, Inc., 524 F.2d at 283.
 
 
 64
 Our conclusion in Part III-B., supra, that Chase did not owe a fiduciary duty to either Ferer-London or Williams & Glyn's defeats plaintiffs' first argument supporting a duty to disclose. The claim of fraudulent concealment based on superior knowledge, however, presents a more difficult problem that requires further analysis.
 
 
 65
 Plaintiffs claim that Chase first concealed material facts on April 29, 1974, when Williams & Glyn's approached Chase to ask for help in locating Ferer-London's Codelco copper, or its proceeds, which had been converted by Ferer-Omaha. At the meeting, Chase officers expressed a willingness to cooperate, but indicated that they would probably not be able to help at all because Ferer-Omaha's records were "chaotic". Williams & Glyn's did not ask how Chase's credit arrangement with Ferer-Omaha operated, whether Ferer-Omaha receivables had been assigned to Chase, or how Chase was repaid by Ferer-Omaha. Chase, of course, did not volunteer the information. Plaintiffs claim that Chase kept the operation of the credit arrangement concealed throughout the bankruptcy proceedings and that plaintiffs did not discover its existence until the summer of 1977.
 
 
 66
 While there is evidence that Chase did not present a detailed explanation of its credit and security agreement with Ferer-Omaha, plaintiffs failed to establish that Chase's knowledge was "superior", because all of the information that plaintiffs now claim was concealed from them was either a matter of public record, was not pursued by plaintiffs, or was disclosed, at least in part, by Chase.
 
 
 67
 In the April 1974 meeting, the first time it is claimed that Chase concealed the existence of the collateral account, Williams & Glyn's never inquired about Chase's credit arrangement with Ferer-Omaha, and there was nothing about Williams & Glyn's request for assistance to indicate that the credit and security agreement information would be useful to Williams & Glyn's. Indeed, it seems reasonable for Chase not to have volunteered the information at the time, particularly because a bank should keep its own customers' affairs confidential. Cf. Graney Development Corp. v. Taksen, 92 Misc.2d 764, 400 N.Y.S.2d 717 (N.Y.Sup.Ct.), aff'd, 66 A.D.2d 1008, 411 N.Y.S.2d 756 (App.Div.1978).
 
 
 68
 Moreover, on May 2, 1974, a lock box arrangement identical to that used by Chase prior to the bankruptcy petition had already been approved by the bankruptcy court. A stipulation entered into between Chase, USNB, and Ferer-Omaha and ordered by the court provided that Chase and USNB would continue financing FererOmaha, and that Chase would use a lock box, collateral account, and operating account. That stipulation and order was part of the public record in the bankruptcy proceedings that Williams & Glyn's and Ferer-London participated in.
 
 
 69
 Additionally, in response to an inquiry from a Williams & Glyn's officer, a lawyer for Chase explained generally how a lock box system operated. However, the Williams & Glyn's officer never pursued the matter, and never even asked when Chase started using the lock box system with Ferer-Omaha.
 
 
 70
 Finally, as the district court pointed out, although plaintiffs had all the resources of the bankruptcy litigation process available to them before executing the release, they never attempted to use those tools to discover how Chase's credit arrangement with Ferer-Omaha operated. See Dambmann v. Schulting, 75 N.Y. 55, 61-62 (1878); see also Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).
 
 
 71
 The second instance of Chase's alleged concealment related to the Codelco refunds. Plaintiffs claimed that Chase knew that a large portion of the refunds were owed to Ferer-London (and ultimately to Williams & Glyn's), but decided to conceal receipt of the Codelco refunds and apply them instead to Ferer-Omaha's indebtedness. Plaintiffs especially rely on the facts surrounding the Codelco refunds as strong evidence supporting the jury's finding of misrepresentation or concealment.
 
 
 72
 The evidence shows, however, that the schedule sent to Williams & Glyn's listing the refunds due from Codelco clearly revealed that Chase claimed to be entitled to all of the Codelco refunds regardless of who financed the original contracts. On one particular occasion Chase's attorney told Gadsden, the attorney for Williams & Glyn's, "that Chase has received a payment for Codelco within the last ten weeks." Yet, until this lawsuit, Williams & Glyn's never objected to Chase's position.
 
 
 73
 In the absence of any direct inquiry from plaintiffs, Chase, which had a perfected security interest in all of Ferer-Omaha's property and which occupied a position adverse to plaintiffs in the bankruptcy proceedings, had no reason to assume that the mechanics of its financing and security arrangement with Ferer-Omaha were of material interest to plaintiffs, who took no steps in the bankruptcy proceedings to discover those arrangements. These simply are not the kinds of circumstances that give rise to an affirmative duty to disclose, whose breach might be the predicate for a fraud claim. Chase dealt fairly with plaintiffs and in a manner consistent with its minimal obligations to them and its more substantial obligations to its own customer, Ferer-Omaha.
 
 
 74
 Furthermore, throughout the bankruptcy proceedings plaintiffs were represented by counsel, knew the general nature of their claims, participated in arm's length negotiations with Chase, and knew generally what was given up by the release executed by Williams & Glyn's. See Gurnee v. Hasbrouck, 267 N.Y. at 62, 195 N.E. at 688; Mittendorf v. J.R. Williston & Beane, Inc., 372 F.Supp. 821 (S.D.N.Y.1974). Under all these circumstances, plaintiffs' actions for money damages based on misrepresentation fail as a matter of law. Similarly, no fraud having been established, the release given by Williams & Glyn's must be upheld as valid and binding.
 
 2. Scope of the Release
 
 75
 At trial and on appeal Williams & Glyn's has argued that the release was not broad enough to bar the claims asserted in the instant case. This argument is without merit, for Williams & Glyn's released:
 
 
 76
 causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law, in admiralty, or in equity, * * * by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents, arising out of any transactions or occurrences involving Williams & Glyn's Bank Ltd. and Aaron Ferer & Sons Co., a Nebraska corporation, or Aaron Ferer & Sons, Ltd., a United Kingdom corporation, or any transactions or occurrences involving The Chase Manhattan Bank, N.A. * * * and Aaron Ferer & Sons, Co., or Aaron Ferer & Sons, Ltd.; * * *.
 
 
 77
 The language chosen was broad and unambiguous. Surely the present claims arise "out of transactions or occurrences" involving Williams & Glyn's Bank, Ltd., and Ferer-Omaha or Ferer-London. Further, the release was drafted in part by a Williams & Glyn's attorney. As signatory to the release, Williams & Glyn's is bound by it and precluded from suing Chase on the present claims. See Lucio v. Curran, 2 N.Y.2d 157, 157 N.Y.S.2d 948, 139 N.E.2d 133 (1956). Thus, dismissal of Williams & Glyn's entire action was correct.
 
 3. Effect of the Release on Ferer-London
 
 78
 Chase claims that Ferer-London, a non-signatory, having assigned its interest to Williams & Glyn's, is also bound by the release and lacks standing in these proceedings. An unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor. See Acme Blacktop Paving Corp. v. Brown & Matthews, Inc., 30 A.D.2d 1042, 294 N.Y.S.2d 826 (App.Div.1968). On May 6, 1974, Ferer-London formally assigned to Williams & Glyn's:
 
 
 79
 [A]ll our rights and interests in the copper wheresoever situate or if sold in the sale proceeds thereof and authorise you to take all necessary action in your own name or ours to enforce your rights over the copper to sell the copper and to realise and collect the sale proceeds without reference to us.
 
 
 80
 Although it might be argued that the assignment from Ferer-London to Williams & Glyn's was an assignment of all rights in the Codelco copper, we view the assignment to be more in the nature of an assignment as security for an antecedent debt owed to the assignee, Williams & Glyn's. In such circumstance New York law recognizes the right of the assignor, Ferer-London, to sue the obligor, Chase, in order to enforce its rights and ensure that the assignee prosecutes the cause vigorously. See Fifty States Management Corp. v. Pioneer Auto Parts, Inc., 44 A.D.2d 857, 355 N.Y.S.2d 856 (App.Div.1974).
 
 
 81
 Moreover, the assignment from Ferer-London to Williams & Glyn's was related to particular lots of copper financed by Williams & Glyn's, and Ferer-London claimed in the bankruptcy proceedings that Ferer-Omaha converted Ferer-London copper over and above that financed by Williams & Glyn's. Therefore, even if we were to view the assignment as a general assignment, Ferer-London would still have standing with regard to its claim that Ferer-Omaha converted $1 million worth of its receivables in excess of those assigned to Williams & Glyn's.
 
 
 82
 Since the release executed by Williams & Glyn's disposes of its entire action, but does not bind Ferer-London, we must, finally, consider the merits of Ferer-London's remaining cause of action--money had and received.
 
 D. Money Had and Received
 
 83
 The essential elements in a claim for money had and received under New York law are that (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money. See Miller v. Schloss, 218 N.Y. 400, 407, 113 N.E. 337 (1916).
 
 
 84
 We need not decide whether the first two elements of the claim were proved, because assuming, arguendo, that Ferer-London proved both of them, it failed on the third element because, under the circumstances of this case, equity does not require Chase to return any funds to Ferer-London.
 
 
 85
 The fundamental cause of Ferer-London's problems was that it allowed Ferer-Omaha to take possession of the Codelco copper and treat it as its own. Ferer-Omaha's refiners and customers believed that the copper belonged to Ferer-Omaha, and, as the jury found, Chase had no actual knowledge of Ferer-London's ownership interest in the receivables before the bankruptcy petition was filed. Most importantly, Ferer-London failed to do anything, either legally or practically, to give notice of its ownership of the copper or of its claim to the receivables.
 
 
 86
 Furthermore, Chase was entitled to rely on the documents it received from Ferer-Omaha. New York public policy disfavors attacks based on the assertion that an asset of a bank is something less than it appears to be on its face. See Franklin National Bank v. Skeist, 49 A.D.2d 215, 373 N.Y.S.2d 869 (App.Div.1975). Ferer-London cannot now claim that Chase should have looked behind the accounts receivable assigned to it to ascertain the validity of Ferer-Omaha's interest in the Codelco copper. Moreover, Chase relied on its receipt of the money now claimed by Ferer-London when, in the Chapter XI proceeding, it reduced the amount of its claim based on Ferer-Omaha's indebtedness to Chase. Although our ultimate resolution of this case means that we do not have to pass on the propriety of the summary judgment ruling made by Judge Griesa, we think that Chase's reliance on Ferer-London's position as an unsecured creditor in the Chapter XI proceedings is a factor which mitigates against Chase's having to return any money to Ferer-London. See Bank Saderat Iran v. Amin Beydoun, Inc., 555 F.Supp. 770 (S.D.N.Y.1983). See also Miller v. Meinhard-Commercial Corp., 462 F.2d 358 (5th Cir.1972).
 
 
 87
 Accordingly, under the circumstances presented in this case, where the loss must be borne by one of two innocent parties, such loss must be borne by the party whose conduct brought about the situation that caused the loss--Ferer-London. See State Farm Mutual Auto Insurance Co. v. Stokes, 65 Misc.2d 316, 317 N.Y.S.2d 706 (Civ.Ct.1970). Ferer-London's count for money had and received was, therefore, properly dismissed by the district court.
 
 IV. CONCLUSION
 
 88
 We conclude that the district court correctly dismissed plaintiffs' negligence claims on the basis of New York's statute of limitations. The district court was also correct in dismissing plaintiffs' claims for breach of a fiduciary relationship because Chase had no such relationship with either plaintiff. The misrepresentation and rescission counts were properly dismissed because plaintiffs failed to prove either that Chase owed a duty of disclosure to either Ferer-London or Williams & Glyn's, or that Chase concealed any material fact from the plaintiffs. All of Williams & Glyn's claims are barred by its release, knowingly and voluntarily given. Finally, Ferer-London did not prove that equity and good conscience required Chase to return any of the disputed money it had received. Accordingly, the district court's judgment in both actions is affirmed.