In re John FORDHAM, Dennis Carlson, Roger Carlson, Debtors.

FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,

v.

John FORDHAM, Dennis Carlson and Roger Carlson, Defendants.

Bankruptcy Nos. 89–41001, 89–41002 and 89–41004. Adv. No. 90–4009.

United States Bankruptcy Court, D. Massachusetts.

Aug. 1, 1991.

Alan B. Rubenstein, Rackemann, Sawyer & Brewster, Boston, Mass., for Federal Deposit Ins. Corp.

Mark N. Polebaum, Hale and Dorr, Boston, Mass., for debtors.

**OPINION**

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This is a so-called "lender liability" case, replete with all the theories that resourceful counsel can muster. First Mutual Bank for Savings ("First Mutual"), the original plaintiff, has moved for summary judgment with respect to its claims under certain personal guarantees and with respect to Counts I through IV of the counterclaim of the defendants and chapter 11 debtors John Fordham, Dennis Carlson and Roger Carlson (the "Debtors"). The Debtors have filed a cross-motion for summary judgment on Count I of the counterclaim. They have also moved for leave to file an amended and supplemental answer, counterclaim, crossclaim and jury demand. This amendment would add a count for negligence, recast the fiduciary duty claim, amend the fraud claim, and make various other minor amendments. After the argument on the summary judgment motions, the Federal Deposit Insurance Corporation ("FDIC"), as Liquidating Agent/Receiver for First Mutual, was substituted as plaintiff. It has sought leave to file an amended reply to the Debtors' counterclaims in which it asserts new defenses under 12 U.S.C. § 1823(e), under the doctrine of *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and under the federal holder in due course doctrine. Set forth here are my conclusions of law on all four motions.

This adversary proceeding originated as an action commenced by First Mutual in state court shortly prior to the Debtors' chapter 11 filings here. That action was brought against the Debtors and one William C. McLay ("McLay"), who is not a debtor in this court. In Count I of the complaint, the only count encompassed in First Mutual's present motion, First Mutual seeks judgment against the Debtors for all amounts due under: (i) the terms of a promissory note dated November 9, 1987 in the principal sum of $12,500,000 (the "Note") signed by the Debtors and McLay as partners on behalf of Rivers Edge Realty Partnership ("Rivers Edge"), and (ii) the

terms of an instrument of the same date guarantying payment of the Note and signed by the Debtors and McLay in their individual capacities (the "Guaranty"). The other counts of the complaint seek to reach and apply various properties in satisfaction of the requested judgment. The Debtors have responded with an answer, counterclaim, crossclaim against McLay and jury demand. In their counterclaim, the Debtors allege that First Mutual breached its contractual obligations contained in the various loan documents (Count I), breached a fiduciary duty owed them (Count II), committed unfair acts and deceptive practices in violation of Mass. Gen.L. ch. 93A (Count III), and misrepresented the terms of the loan (Count IV).

Following the filing of their chapter 11 petitions in 1989, the Debtors removed the case as against them to this court and the matter was scheduled for jury trial. The parties engaged in substantial discovery. At the final pretrial, it appeared that there may be no genuine issues as to any material fact with respect to at least some of the legal questions. Having in mind also the controversy concerning this court's jurisdiction to conduct a jury trial, I ordered the trial continued generally pending the filing and disposition of the present motions for summary judgment. The same pretrial order required First Mutual to file an opposition to the Debtors' motion for leave to file an amended and supplemental answer,

counterclaim, crossclaim and jury demand, which had been filed three days before. I thereafter heard arguments on the three motions then pending and took them under advisement.

### I. PRINCIPLES OF SUMMARY JUDGMENT

■ The principles governing the granting of summary judgment under Fed. R.Civ.P. 56[1] are familiar. In order to prevail against First Mutual's motion, the Debtors must show that there exists a genuine issue of material fact concerning First Mutual's claim or any counterclaim of the Debtors. Applicable substantive law determines materiality. Only those facts that might affect the outcome of the case are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the motion is supported by an affidavit, the affidavit must "set forth such facts as would be admissible in evidence." Fed.R.Civ.P. 56(e). It is not sufficient that the nonmoving party contest a material fact; the factual issue must be a genuine one. The rule itself states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set

---

1. Rule 56 provides in part:
   ... A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

   .    .    .    .    .

   ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

   .    .    .    .    .

   Supporting and opposing affidavits shall be made on personal knowledge, shall set forth

such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copes of all papers or parts thereof referred to in an affidavit shall be attached hereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). The Debtors do not contest the existence of the loan or the execution of the loan documents; they rely solely upon their counterclaims. On these they have the burden of proof. The Supreme Court has clarified the application of summary judgment principles to a case where the non-moving party has the burden of proof:

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.... Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of his motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact. But ... we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar material *negating* the opponent's claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

This does not mean that the nonmoving party must, for example, depose his own witnesses in order to show that he can sustain his burden of proof. He may simply name the witness from whom he would elicit the necessary facts, and it is up to the moving party to somehow show that the named witness' possible testimony raises no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. at 328, 106 S.Ct. at 2555 (White, J. concurring). First Mutual is not faced with such a daunting task. It has deposed the witnesses upon whom the Debtors rely so that we know what the Debtors' evidence will be. Extensive discovery conducted by both parties reveals a substantial body of undisputed facts.

## II. FACTS

This case is a microcosm of the current travails of real estate development in New England resulting from the optimism concerning real estate investment which was so pervasive in the mid 1980's. Because of the broad range of charges contained in the Debtors' counterclaim, some elaboration is required.

On November 9, 1987, First Mutual agreed to make an acquisition and construction loan to Rivers Edge in the sum of $12,500,000.00. The purpose of the loan was three-fold: to refinance the prior acquisition of a mill complex in Lincoln, Rhode Island known as Albion Mills; to substantially rehabilitate the property; and to convert it into approximately 200 residential condominiums with a health club, tennis court and parking for 400 automobiles. The loan is evidenced by the Note, the Guaranty, a loan agreement and a construction loan agreement, all dated November 9, 1987. This loan is at the center of the current controversy.

Rivers Edge is a Massachusetts general partnership, the general partners of which are McLay and the three Debtors. McLay holds a fifty percent interest in the partnership, Roger Carlson and John Fordham each hold a twenty-two percent interest, and Dennis Carlson holds a six percent partnership interest.

McLay is an architectural designer. Prior to 1975, he worked in various construction jobs, including four years as a mechanical designer. In 1975, he formed W.C. McLay Associates, an architectural design firm providing design, civil engineering, and construction management services. He was thereafter active in architectural design and construction management. In 1983, he began engaging in real estate development, including condominium projects.

The principal business of the Debtors is Moisture Systems Corporation. Moisture Systems Corporation is a Massachusetts corporation founded by Roger Carlson and

John Fordham in 1976. It is in the business of manufacturing and selling moisture detection instrumentation, and has been quite successful. Roger Carlson is its president, John Fordham its vice-president and treasurer, and Dennis Carlson its clerk. The three Debtors are also the sole directors. Roger and Dennis Carlson are brothers.

Beginning in the early 1980's, the Debtors began investing in real estate and undertaking real estate development projects on a part-time basis. Their projects included multi-family residences and office buildings. With respect to most, if not all, of the projects, Dennis Carlson acted on behalf of Roger Carlson and John Fordham in performing the responsibilities of the owner.

The Debtors met McLay in 1984 when they hired him as the designer for one of their development projects. Eventually, McLay and the Debtors became partners in several projects involving investment in real estate or its development. Title to a project was held either by a partnership of which McLay and the Debtors were partners, or by a real estate trust of which they were beneficial owners. Typically, McLay held a fifty percent interest in the partnership or trust, and the others held the remaining fifty percent. McLay usually assumed responsibility for development; Dennis Carlson participated with him in at least some of the management decisions.

In early 1986, McLay discovered Albion Mills, the project which has generated the present controversy. The property was owned at the time by American Tourister, Inc. and had been used as a factory. A previous developer had obtained zoning approvals to convert the mill to 200 residential condominiums. McLay entered into a purchase and sale agreement dated May 16, 1986 to purchase the property for $1,500,000. Rivers Edge Realty Partnership was formed by agreement dated June 9, 1986. The acquisition was financed by a demand loan from Home National Bank. Because of a loan limit restriction at Home National Bank, the bank could not make the loan to the partnership. The partners

therefore formed Waterfall Realty Corporation ("Waterfall") to be the borrowing entity and to take title. The property was conveyed to the corporation by deed dated September 12, 1986.

The partners secured an appraisal which concluded that the highest and best use of the property was as residential condominiums. They therefore decided to pursue such a development of the property. McLay prepared financial projections for a 200 unit condominium. His revised projection dated March 12, 1987 projected the total costs to be $17,643.932, in four phases.

During the period of September, 1986 through February, 1987, the partners searched without success for financing. McLay decided to turn to a mortgage broker for assistance. Spectrum Financial Corporation ("Spectrum") was recommended to McLay, and the partners retained Spectrum to secure the required financing. Spectrum brought them to First Mutual.

On May 5, 1987, in the name of Waterfall, the Debtors applied for a loan from First Mutual in the amount of $17,643,932, with the maximum balance outstanding at any one time to be $12,500,000. The requested loan was for a term of three years, based upon McLay's projection that the project would be completely sold out in three years or less. Although the projections indicated that the total cost of the project would be about $17.7 million, it was anticipated that as condominium units were completed and sold the proceeds of sales would be paid to the lender, reducing the principal balance of the loan. Thus, given the partners' assumptions with respect to the construction schedule and condominium sales, they were projecting that no more than $12.5 million would be outstanding at any one time.

In a commitment letter to Waterfall dated June 24, 1987, First Mutual agreed to make a first mortgage construction loan in the amount of $17,700,000 with a maximum balance at any one time of $12,500,000. The commitment was expressly conditioned upon another lender participating for not

less than fifty percent of the loan. The commitment letter also contained various conditions to First Mutual's obligation, including the condition that at least forty condominium units be presold as evidenced by binding purchase and sale agreements with a ten percent deposit.

The commitment letter was signed by the four principals of Waterfall on June 29, 1987, pursuant to the advice of counsel. It was returned to First Mutual with a transmittal letter from Spectrum which stated the following:

> Our client, Waterfall Realty Corporation, accepts the commitment of First Mutual of Boston to finance the above-captioned project subject to the following clarifications and modifications of your formal commitment letter of June 24, 1987.
>
> .    .    .    .    .
>
> With reference to Paragraph *Pre–Sale Requirements,* the Borrower is now in the process of entering into at least forty binding Offers to Purchase with deposits of $500 for each one. Since the loan closing may occur prior to the completion of condominium documents and the review of same by prospective unit purchasers, it may not be possible to have all purchase offers to be turned into purchase agreements by the closing date. It was our understanding that this scenario was acceptable to the Lender.

By letter dated July 6, 1987, First Mutual referred generally to the prior transmittal letter, raised no objection to the quoted language, and discussed a number of other terms.

McLay had had prior dealings with First Mutual and with one James F. Gerrity ("Gerrity"), who was a member of First Mutual's board of directors and its board of investment. In January of 1987, McLay had commenced discussions with First Mutual concerning the purchase from First Mutual of its fifty percent equity interest in a condominium project known as Newport Commons, which was in financial difficulty. The sale was thereafter consummated; First Mutual absorbed a significant loss on the project and provided McLay with a bridge loan of $800,000 and a second mortgage of $50,000.

Gerrity's company, Gerrity Lumber Company, had been the lumber supplier on a number of McLay's prior development projects. It was also the prime lumber supplier for the Albion Mills project, both before and after the November 9, 1987 loan. At the time that Gerrity voted to approve the Albion Mills loan, McLay was indebted to Gerrity Lumber Company for lumber bills which were over ninety days past due. On February 24, 1988, three months after the Albion Mills loan closed, Gerrity's family trust loaned McLay $1.5 million to purchase undeveloped land in Westerly, Rhode Island. McLay allegedly diverted monies from the Albion Mills loan to pay interest on the Gerrity loan. Gerrity later posted a $500,000 letter of credit required by a bank as a condition to refinancing part of the Gerrity loan.

At about the same time that the partners had applied to First Mutual for financing, McLay began looking for a contractor to do the construction work on the Albion Mills project. The partners decided to give the job to one Joseph Warris. Warris formed a corporation called McWar Associates, Inc. ("McWar") to be the construction manager for the project. Waterfall entered into a letter of agreement with McWar on or about May 28, 1987, pursuant to which McWar was authorized to do some preliminary construction work on the project consisting of asbestos removal and site work. Rivers Edge and McWar Associates entered into a formal construction management agreement for the project on August 24, 1987. The contract called for McWar to perform all of the construction work for the project for a price of $12,500,000, excluding site work. Preliminary work commenced in the summer of 1987. The partners funded this work out of their own pockets.

The search for a fifty percent participant with First Mutual proved to be difficult. By September, 1987, Home National Bank wanted repayment of its $1.5 million demand loan which had been made for acquisition of the property. The partners re-

quested First Mutual to make an interim loan of $1.5 million to "take out" Home National Bank. First Mutual agreed, and made a $1.5 million interim loan to Waterfall on September 30, 1987, the proceeds of which were used to pay off Home National Bank. Waterfall thereafter transferred title to Rivers Edge.

One of the conditions of the First Mutual commitment was that the borrower obtain a new appraisal of the property meeting the standards of Regulation R41C of the Federal Home Loan Bank Board and showing a completed value of not less than $22,125,000. Waterfall hired Schaeffer Bates & Co. of Providence, RI to perform a preliminary appraisal. Schaeffer Bates issued two preliminary appraisals in letter form, one dated July 31 and the other August 12, 1987. The July 31 preliminary appraisal showed a value of $24,408,000. The August 12 preliminary appraisal revised the valuation to $25,764,000. Both appraisals were based upon the partners' estimate of a three year construction and sellout period, and stated: "The three year sellout period would require approximately 5.56 sales per month: in our estimation, an achievable goal." The August 12 appraisal was sent to Spectrum, McLay and First Mutual.

By October, 1987, the partners and First Mutual had searched for a participating lender for over three months without success. By then, the partners had spent from their own pockets about $800,000 on preliminary work for designs, permits, asbestos removal and site work.

First Mutual agreed, in October, to a restructuring of the loan so that it could be made without a participant. It also recast the form of the loan into a $12.5 million revolving credit construction loan, with a cumulative borrowing limit of $17.7 million. This arrangement was virtually identical to the original commitment that the outstanding balance not exceed $12.5 million at any one time. On October 16, 1987, First Mutual issued a second commitment letter for a $12.5 revolving credit loan, which was signed by the partners on October 22, 1987. This commitment letter was also conditioned upon forty presales evidenced by binding purchase and sale agreements rather than offers to purchase. Receipt of an appraisal and final plans and specifications were also conditions to the October commitment letter. The commitment letter was returned to First Mutual by Spectrum with a transmittal letter dated October 22, 1987 stating that Rivers Edge accepted the new commitment from First Mutual "subject to the following clarifications." With reference to the presale requirement of the commitment letter, the acceptance letter stated:

> ... the forty presales will be evidenced by binding Offers to Purchase along with deposits of $500 for each. These offers will be turned into Purchase and Sale Agreements as soon as practical.

The closing of the loan was scheduled for November 9, 1987. As of that date, however, Rivers Edge had received only thirty-seven offers to purchase. The partners and First Mutual, with their respective counsel, nevertheless met on November 9, 1987; the partners executed the Note, the Guarantee and the related documents. Because of their inability to meet the presale requirement, no funds were disbursed at that time.

According to the Debtor John Fordham, but disputed by First Mutual, a First Mutual loan officer at the closing, one Joan Prevett, "guaranteed me [Fordham] she wouldn't release the money until we had the 40 P & S's, guaranteed me she wouldn't do that."

Among the documents executed at the closing were a loan agreement and a construction loan agreement. The loan agreement required First Mutual to make an initial disbursement of $2,173,843.00 to cover the acquisition cost and certain "soft costs" for items not involving actual construction, without conditions pertaining to presales and other matters. It also provided that prior to the disbursement of additional funds, Rivers Edge was to have complied with the presale and other conditions set forth in the commitment letter and articles III and IV of the construction loan agreement, and that Rivers Edge was to

furnish additional collateral in the amount of at least $2,500,000.

Article 4.2(a) of the construction loan agreement provides in part:

> There shall be conditions of the initial funding of the loan that not less than forty (40) units shall have been presold as evidenced by binding Offers to Purchase, which shall be converted within thirty (30) days of the Construction Closing into binding Purchase and Sale Agreements for the sale of the condominium units to bona fide third-party purchasers for purchase prices with non-refundable deposits (except for failure to secure financing or failure by Seller to perform) ...

The construction loan agreement provides in Article 3.1 that as "conditions precedent" to First Mutual's obligation to fund, a number of other documents were to be furnished by the borrower, which are described in part as follows:

> ... (b) Preliminary Plans (including site and mechanical plans) and Specifications with the approval of Borrower and Lender, noted thereon and acknowledged by the Construction Manager as being the basis for its Construction Management Contract negotiations with Borrower. All such plans and specifications must be approved by all local, state and federal regulatory authorities ...
>
> ... (c)(i) The Construction Management Contract ...
>
> ... (x) An appraisal of the Premises directed to Lender, ... substantiating the loan at not greater than eighty percent (80%) of value, prepared by a Member of the Appraisal Institute of the American Institute of Real Estate Appraisers acceptable to Lender, which appraisal shall meet the standards of Federal Home Loan Bank Board Regulations R41C which show [sic] a value not less than $22,125,000 ...

Article 4.12 of the construction loan agreement provides:

> Lender may at any time make advances prior to or without the fulfillment by Borrower of all of the conditions precedent thereto whether or not known to Lender, and no such advance shall constitute a waiver by Lender of the requirement that all conditions, including those not performed, shall be required with respect to all future advances.

Article 6.3 of the construction loan agreement provides in pertinent part:

> ... All conditions of the obligations of Lender to make advances hereunder are imposed solely and exclusively for the benefit of Lender and may be freely waived or modified in whole or in part by Lender at any time ...

An initial disbursement in the amount of $2,299,843.78 was made on or about November 30, 1987. Rivers Edge submitted its first request for "hard" (construction) costs on December 4, 1987 in the amount of $625,666.00. It had a meeting with First Mutual on December 9 to discuss the requisition. The meeting was attended by McLay, Dennis Carlson, and the attorney for Rivers Edge, Jeffrey Williams, Esq. ("Williams"), among others. Williams, McLay and Dennis Carlson all knew that the presale conditions of Article 4.2(a) of the construction loan agreement had not all been met. They nevertheless asked First Mutual to fund the requisition because the construction work had been proceeding and the workers had to be paid. Williams had discussed the issue with McLay and Dennis Carlson, including the various advantages and disadvantages, and on behalf of Rivers Edge the three requested that the requisition be funded. First Mutual agreed to fund the requisition, and $625,000 was disbursed on December 16, 1987.

Rivers Edge continued to request disbursement of construction costs. First Mutual approved the requests and disbursed loan proceeds even though Rivers Edge had not received forty offers to purchase and had converted very few of the offers which it had received into purchase and sale agreements. The second disbursement for construction costs was made on March 4, 1988, and thereafter disbursements were made about once a month until the balance of the loan commitment was exhausted. McLay and Dennis Carlson were well aware that Rivers Edge did not

have forty purchase and sale agreements as the funding of the project proceeded, but did nothing to object to further funding. In March of 1988 First Mutual received a draft of the appraisal referred to in the construction loan agreement; the final appraisal was delivered two months later.

When First Mutual disbursed the loan proceeds, it did so by crediting the amount of the disbursement to a Rivers Edge checking account at First Mutual. The checkbook for this account was kept at Moisture Systems Corporation by a Moisture Systems bookkeeper, under the supervision of Dennis Carlson. When funds were paid out of that checking account, the checks would be prepared by the bookkeeper and signed by one of the Rivers Edge partners. Some checks were signed by McLay and others were signed by Dennis Carlson or John Fordham.

In late 1987, at about the time of the first disbursement of the loan proceeds, difficulties began developing between Rivers Edge and its construction manager, McWar. Rivers Edge believed that Warris, McWar's principal, was not soliciting bona fide bids from subcontractors and was awarding subcontracts to his friends. By letter dated January 28, 1988 signed by each of the partners, Rivers Edge notified McWar that its construction management contract was terminated. McLay suggested that his company, W.C. McLay Associates, take over as the construction manager for the project on the same basis as McWar. The Debtors agreed and informed First Mutual of the change. Rivers Edge decided to have McLay re-bid all of the major trades for the project, which took additional time. No written construction management agreement was executed with McLay.

After McLay took over as the construction manager, the project proceeded fairly smoothly until the Fall of 1988. In November of 1988, McLay informed First Mutual that the project was over budget by about $1,500,000 and therefore underfinanced by that amount. The Debtors allege that these cost overruns were due at least in part to McLay using some of the funds for other projects of his own and to McLay obtaining "kick-backs" from McWar. Pursuant to Article 4.6 of the construction loan agreement, Rivers Edge was obligated to make an equity investment in whatever amount was necessary to ensure that the unadvanced loan commitment plus the amount of the equity investment was sufficient to complete the project. Rivers Edge and First Mutual consequently agreed that as a condition to further funding of the loan Rivers Edge would provide First Mutual with further equity of at least $1.5 million. In January, 1989, Rivers Edge put an additional $750,000.00 into the project, but failed to put up the remaining $750,000.00 as the result of McLay defaulting on his obligation to do so.

By February of 1989, First Mutual had disbursed the entire $12,500,000.00 loan commitment, as well as most of the additional equity funds put up by Rivers Edge. In March, First Mutual concluded that the cost overruns amounted to $4 million. It informed Rivers Edge that the loan was "out of balance," and requested Rivers Edge to propose a plan to address the cost overrun.

In April of 1989, the partners decided to abandon their original plan to sell individual condominium units, and to redirect their efforts toward finding a buyer for the entire project. This also proved unsuccessful. At about the same time, all construction work ceased. Only twenty condominium units had been completed and none were sold. By letter dated June 21, 1989, counsel for the Debtors advised First Mutual that completion of the project was not financially feasible, and that the Debtors were not in a position to continue paying interest on the outstanding loan. The present suit followed. On August 28, 1990, First Mutual held a foreclosure sale of the property and purchased it for $4,200,000.

## III. NATURE OF LIABILITY ASSERTED AGAINST DEBTORS—GOVERNING LAW

■ There are two preliminary matters. In its complaint, First Mutual requests judgment against the Debtors, jointly and

severally, for "all amounts due under the Promissory Note and the Guaranty." In its motion for summary judgment, however, First Mutual requests judgment only with respect to its claim on the Guaranty and with respect to all four counts of the counterclaim. First Mutual apparently relies only on the Guaranty because of clauses therein waiving various defenses. In any event, I have dealt with First Mutual's motion as it is framed, although, as shall be seen, I am unpersuaded that its claim under the Note is any less meritorious.

Article 6.8 of the construction loan agreement provides in part:

> All Loan Documents other than the Note, the Loan Agreement, and the Guaranty shall be governed by, construed and interpreted in accordance with the laws of the State of Rhode Island. The Note, the Loan Agreement, and the Guaranty shall be governed by, construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts ...

The "Loan Agreement" referred to in this provision is the document dated November 9, 1987 entitled "Loan Agreement" which the parties executed in connection with First Mutual's initial advance under the $12,500,000 construction loan agreement covering acquisition and "soft" costs. Although Article 6.8 could be construed as making the law of Rhode Island the governing law concerning the construction loan agreement, both parties treat the law of Massachusetts as the law governing all loan documents. Therefore, I shall do the same. The oral misrepresentation allegedly made by First Mutual at the loan closing, moreover, was made in Massachusetts. Its consequences should therefore be determined by the law of this Commonwealth. Because that statement refers to a term of the construction loan agreement and is intertwined with the parties' contractual rights thereunder, it makes sense to treat all causes of action as governed by the law of Massachusetts.

## IV. BREACH OF CONTRACT INCLUDING OBLIGATION OF GOOD FAITH

■ In Count I of the counterclaim, the Debtors allege that First Mutual breached "promises" it made in its Commitment Letter of October 22, 1987 when it disbursed the loan proceeds without requiring satisfaction of the conditions pertaining to forty purchase and sale agreements, workable construction drawings, and a General Contractor Agreement. The Debtors say that they relied on these conditions and that by imposing them First Mutual promised that disbursements would not be made unless the conditions were satisfied.

■ There are obvious difficulties with this argument. First Mutual made no "promises", even to Rivers Edge, when it imposed these conditions to its obligation of disbursement. They were only that—conditions precedent to First Mutual's obligation to Rivers Edge to make any advance for construction costs. They were in existence for its benefit and no one else's. This is made abundantly clear by Article 4.12 of the construction loan agreement which permits First Mutual to "make advances prior to or without fulfillment by Borrower of all of the conditions precedent thereto." It is again emphasized by Article 6.3 of the construction loan agreement stating that "[a]ll conditions of the obligations of Lender to make advances hereunder are imposed solely and exclusively for the benefit of Lender and may be freely waived or modified in whole or in part by Lender at any time." Even in the absence of provisions expressly authorizing a waiver of conditions to a lender's obligations, the lender is entitled to waive the conditions because they are for its benefit. *Gatoil (U.S.A.) Inc. v. Washington Metropolitan Area Transit Authority*, 801 F.2d 451, 455 (D.C.Cir. 1986); *Walter E. Heller & Co. v. American Flyers Airline Corp.*, 459 F.2d 896, 901 (2d Cir.1972).

■ The Debtors' cause is not advanced by Article 6.7 of the construction loan agreement, which states that "[n]o provision of the Loan Documents ... may be ... waived ... except by an instrument in writing signed by the party against whom enforcement of the ... waiver ... is

sought." This clause, like the conditions themselves, is intended for the benefit of First Mutual. It is meant to prevent the borrower from requiring disbursement, notwithstanding the lack of satisfaction of one or more of the conditions, on the ground that First Mutual had orally waived such condition. It tortures the provision beyond all reality to read it to mean that First Mutual cannot voluntarily effect an oral waiver of a condition precedent to its own obligation. Such an interpretation, moreover, would be inconsistent with Article 4.12. It is well established that clauses in a contract should be interpreted as consistent with one another wherever possible. *Truck Drivers, Chauffeurs, and Helpers Union, Local 42 v. Int'l Bhd. of Teamsters*, 482 F.Supp. 266, 271 (D.Mass.1979). Further, it is unnecessary, as the Debtors allege, to treat First Mutual's disbursements as waivers, making them subject to the provisions of Article 6.7. Article 4.12 specifically authorizes First Mutual to make advances even though the conditions have not been satisfied.

■ The Guaranty signed by the Debtors grants First Mutual additional rights concerning the conditions precedent to its disbursement obligation. Paragraph 9 gives it the right to "grant releases, compromises and indulgences with respect to ... any Loan Document." Paragraph 9 also states that "[n]o such action which [First Mutual] shall take or fail to take ... for the performance of any obligations ... of Borrower, nor any course of dealing with Borrower ... shall release Guarantors' obligation hereunder." Paragraph 11 contains waivers of various specific defenses by the Debtors and ends with a waiver of "any other legal or equitable defenses whatsoever to which Guarantors might otherwise be entitled." Waiver of defense provisions in guarantees are enforceable in Massachusetts and elsewhere. *Merrimack Valley National Bank v. Baird*, 372 Mass. 721, 725–726, 363 N.E.2d 688 (1977); *Provident Co-operative Bank v. James Talcott, Inc.*, 358 Mass. 180, 191–192, 260 N.E.2d 903 (1970). *Cf. Shawmut Worcester County Bank v. Miller*, 398 Mass. 273, 280, 496 N.E.2d 625 (1986). (Guarantor may not waive certain rights when there is an express legislative provision to preclude such waiver).

■ The Debtors also charge that in making disbursements without satisfaction of the conditions, First Mutual violated its contractual obligation of good faith. Under Massachusetts law, every contract contains an implied covenant of good faith and fair dealing. *Fortune v. National Cash Register Co.*, 373 Mass. 96, 104, 364 N.E.2d 1251, 1256 (1977) (salesman's employment-at-will contract cannot be terminated to prevent vesting of commission rights for sales already made). Under the Uniform Commercial Code as adopted in Massachusetts, the holder of a note or security interest must act in good faith in the enforcement of his rights. Mass.Gen.L. ch. 106, § 1–106(2) (Law.Co-op.1985 & Supp.1991); *In re Martin Specialty Vehicles, Inc.*, 87 B.R. 752, 765 (Bankr.D.Mass.1988), *rev'd on other grounds*, 892 F.2d 5 (1st Cir. 1989).

This rich legal principle falls on barren ground when it meets the facts here. McLay and Dennis Carlson were well aware that the conditions concerning forty purchase and sales agreements and other matters had not been satisfied. As partners, their knowledge is imputed to Rivers Edge. Mass.Gen.L. ch. 108A, § 12 (Law. Co-op.1985 & Supp.1991). As general partners, they were fully authorized to act on behalf of Rivers Edge in requesting disbursements despite failure of the conditions. Mass.Gen.L. ch. 108A, § 9 (Law.Co-op.1985 & Supp.1991). Therefore, First Mutual was hardly acting in bad faith when it made disbursements in response to the knowing request of its borrower and in accordance with its own contractual rights.

The Debtors' argument that Gerrity's and First Mutual's involvement with McLay somehow motivated First Mutual in ulterior ways is based upon suspicion and surmise. There is absolutely no indication that either of these relationships affected First Mutual's conduct. To the contrary, First Mutual made the disbursements only after it was requested to do so by Rivers

Edge, which by then was heavily committed to the project through expenditure of about $800,000 for preliminary work. There is no showing that Gerrity was motivated by personal concerns in acting as a member of First Mutual's board of directors and board of investment, much less that he influenced the action of his fellow board members or the loan officers handling the matter. Such evidence would therefore be unreasonably speculative. A court need not "accept unreasonable inferences based upon conjecture or speculation." *Santiago–Negron v. Castro–Davila*, 865 F.2d 431, 445 (1st Cir.1989). *See, Yeradi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectman of Town of Randolph*, 932 F.2d 89 (1st Cir. 1991) (inference of malice of board of selectmen from two minor incidents involving individual selectmen held impermissible).

■ The Debtors, finally, charge that First Mutual's disbursement of the funds was done in a commercially unreasonable manner. First Mutual had no obligation to act in a commercially reasonable manner. That is the obligation of a secured party in the foreclosure of its security interest. Mass.Gen.L. ch. 106, § 9–504 (Law.Co-op. 1985 & Supp.1991). Even if First Mutual had such an obligation, its actions here would have satisfied the obligation.

## V. MISREPRESENTATION

■ The Debtors allege in Count IV of their counterclaim that "[b]y executing the Commitment Letter [of October, 1987], First Mutual represented to the [Debtors] the conditions under which First Mutual would issue a construction loan for the Project"; that First Mutual did so "either knowing that the conditions would not in fact be followed, or with reckless disregard of whether the conditions would be followed"; that the Debtors "relied on the representations ... when executing the Loan Documents, including their personal guarantees"; and that "[c]ontrary to the representations ... First Mutual disbursed construction loan funds without requiring that the Project meet the conditions." In the Debtors' proposed amended counter-

claim, they add an allegation that they "also relied on the express oral misrepresentations of First Mutual at the closing and were induced by such misrepresentations into executing the Loan Documents, including their guarantees."

These vague allegations do not comply with the requirement of Fed.R.Civ.P. 9(b) that allegations of fraud shall include "the circumstances constituting fraud ... with particularity." The only evidence that the Debtors have to back up the allegation concerning the oral misrepresentation at the closing is the statement made by John Fordham in his deposition that at the closing a First Mutual loan officer "guaranteed me she wouldn't release the money until we had the 40 P & S's, guaranteed me she wouldn't do that." The Debtors' case on misrepresentation fails even with the proposed amendment, and even if Fordham's statement is considered as incorporated into the pleading so that the Debtors are treated as alleging that the loan officer misrepresented her and First Mutual's intent with respect to the conditions.

■ Perhaps the most basic difficulty with the Debtors' fraud case is that the undisputed facts show the Debtors could not have reasonably relied upon any such representation by First Mutual. The disbursement of funds was within the full control of Rivers Edge, the Debtors' own partnership. If Rivers Edge made no request for funds, obviously none would be disbursed. Fordham and Roger Carlson permitted McLay and Dennis Carlson to run the partnership's day-to-day operations. In their capacity as general partners, McLay and Dennis Carlson handled loan advances with the assistance from the partnership's lawyer. The check book for the Rivers Edge account which received the advances, moreover, was kept at the Debtors' place of business. It is ludicrous for the Debtors now to contend that they relied upon First Mutual in these matters.

■ The Debtors' cause of action for fraud also suffers deficiencies which are related to those of their breach of contract case. Because the conditions were imposed solely for First Mutual's benefit and could

be freely ignored or waived by it, they were terms upon which the Debtors could not reasonably rely as representations inducing them to execute their guarantees. The statement allegedly made by Joan Previtt at the closing was nothing more than a reaffirmation of First Mutual's intention to assert its rights with respect to the condition concerning forty purchase and sale agreements. The condition remained solely for the benefit of First Mutual which could freely ignore or waive it.

The Debtors seek solace in Massachusetts case law that supports a cause of action for fraud in the making of a contract notwithstanding the existence of a contractual provision which is inconsistent with the alleged misrepresentation. They place particular emphasis upon *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass 704, 563 N.E.2d 188 (1990). That decision expanded upon the principle established in *Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941), which held that an action for fraud against a stockbroker is not barred by a clause in the contract disclaiming any representation other than identification of the security purchased and its price.

In *McEvoy*, the plaintiff was a small Worcester travel agency which for over three decades, without a written contract, had provided travel services to the defendant, a large international conglomerate based in Worcester. The defendant orally proposed, and the plaintiff orally assented to, a "long-term" arrangement whereby the plaintiff became the defendant's exclusive agent for all of its Worcester area business. The plaintiff commenced performance under this oral agreement, moving its offices to the defendant's building, signing a five-year lease, hiring extra personnel and purchasing additional equipment to handle the increased work. When the parties were two months into the arrangement, the defendant proposed a written contract which had a one year renewable term and contained a sixty-day termination clause. The plaintiff voiced concerns about these provisions. The defendant reassured it that the termination clause was "inoperative" and "meaningless," a mere technicali-

ty required by its law department. The plaintiff signed the contract based on these statements. Two years later, after two annual renewals, the defendant entered into an arrangement with another agency and terminated the plaintiff's contract by a sixty-day notice. The court upheld a fraud judgment, ruling that in making these statements the defendant had in effect represented that it had no present intention of invoking the termination clause. The court also held that there was sufficient evidence supporting a finding that the defendant had misrepresented its intent.

*McEvoy* is quite different from the present case on the issue of reliance. The court there stressed the reasonableness of the plaintiff's action in relying upon statements which were consistent with the parties' existing oral agreement upon which the plaintiff had already based substantial action. The length of that oral agreement was the subject of mutual oral promises. It was not, as here, merely the condition of one party's obligation to a third party, which could be freely ignored or waived pursuant to the express terms of the agreement. In *McEvoy*, moreover, future events were not within the control of a close affiliate of the plaintiff as they were within the control of Rivers Edge here. In *McEvoy*, finally, the oral representation relied upon was inconsistent with the written agreement. Here, it merely affirms the written agreement.

▮ Nor have the Debtors asserted the existence of credible evidence sufficient to sustain their burden of proving that First Mutual had no intent on November 9 to require satisfaction of the condition requiring forty purchase and sale agreements. They point to only one document—the November 20, 1987 notes of the mortgage broker. The notes contain the words: "Joan Prevett [the First Mutual loan officer] will work around presales ... how soon to P & S ... she wants George to record." The broker, one Casmir Groblewski, testified at his deposition that he did not recall the conversation with Prevett or the specifics of what caused him to write these words. The notes are therefore inad-

missible because they are unintelligible. Even if admissable and even if evidence of a conversation with Prevett, these cryptic notes are at least as consistent with Prevett acceding to the request by Rivers Edge for waiver of the presale condition as they are a reflection of her intent eleven days earlier not to insist upon compliance with the condition.

## VI. NEGLIGENCE

■ The Debtors' proposed amended counterclaim would add a new count for negligence. They allege in this count that "First Mutual had a duty to use reasonable care and prudence in the preparation and offering of the $12,500,000 restructured loan proposal," and that "First Mutual had a duty to obtain a full appraisal in conformity with R–41C and to perform the requisite marketing, construction and credit analyses to determine that the loan proposed and Project covered thereby, [sic] were financially and commercially feasible and viable before issuing the October Commitment Letter and before closing the loan."

Rule 15(a) of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Bankruptcy Rule 7015, provides in part: "[A] party may amend the party's pleading only by leave of court . . .; and leave shall be freely given when justice so requires." Leave to amend may be denied when the proposed amendment would be futile in that it would fail to state a claim for which relief could be granted, or would fail to survive a motion for summary judgment. *Liberty Leather Corp. v. Callum,* 653 F.2d 694, 700 (1st Cir.1981); *Communications Systems, Inc. v. City of Danville, Kentucky,* 880 F.2d 887, 895 (6th Cir.1989).

The proposed new count for negligence in the Debtor's counterclaims would not survive a motion for summary judgment. The Debtors waived any negligence claim by execution of the Guaranty containing the waivers previously discussed. It is well established in Massachusetts that a release of liability for ordinary negligence is valid. *E.g., Minassian v. Ogden Suffolk Downs, Inc.,* 400 Mass. 490, 509 N.E.2d

1190 (1987); *Lee v. Allied Sports Assoc., Inc.,* 349 Mass. 544, 550, 209 N.E.2d 329, 332 (1965). *Compare Henry v. Mansfield Beauty Academy, Inc.,* 353 Mass. 507, 511, 233 N.E.2d 22, 24 (1968) (release may not shield a defendant from responsibility for violation of a statutory duty).

■ A lender, moreover, owes to its borrower or guarantor no duty to use reasonable care to determine that a project is sufficiently feasible to permit repayment of the loan. As among Rivers Edge, First Mutual and the Debtors, Rivers Edge was the party who was in the business of developing real estate and charged with the planning and execution of the Albion Mills project. The Debtors did not rely upon First Mutual's judgment concerning the feasibility of the project or the ability of Rivers Edge to repay the requested loan. They devised the project themselves through Rivers Edge. The projections prepared by Rivers Edge formed a prime basis for First Mutual's decision to make the loan. Thus, while First Mutual may have owed its stockholders or depositors a duty of care in underwriting the loan, it owed no such duty to the Debtors.

Although research of counsel and the court discloses no reported Massachusetts decision on point, numerous decisions elsewhere deny such a cause of action for negligence. In *Commercial National Bank in Shreveport v. Audubon Meadow Partnership,* 566 So.2d 1136 (La.App.1990), the guarantor of a real estate loan brought suit contending that the lender was negligent in failing to obtain an appraisal, in failing to obtain a cost estimate, and in generally failing to investigate the feasibility of the project and the project's ability to generate sufficient funds to repay the loan. The Louisiana Court of Appeals affirmed the lower court's order sustaining the lender's demurrer, holding that a lender owes no duty of care to a loan guarantor to determine the feasibility of a project or repayment of the loan.

To impose such requirements would significanlty alter the relationship between banks and those with whom they deal. In effect, it would impose liability upon

banks for business failures arising through ventures they financed. As a guarantor, Lucien could and should have apprised himself of the soundness of the loan's ultimate use prior to obligating himself, rather than delaying until later and then attempting to seek refuge in grievances concerning CNB's business practices.... If, in truth, CNB's methods of analyzing loan applications are deficient and result in imprudent business decisions, shareholders are harmed, not borrowers or guarantors who presumably are cognizant both of the potential risks they encounter and their duty to repay the money loaned. In short, within the facts alleged, we find no source of a duty in tort which would impose liability upon the bank.

566 So.2d at 1140.

Using much the same reasoning, the court in *Rojas v. First Bank National Ass'n*, 613 F.Supp. 968 (E.D.N.Y.1985) held that a lender owed a guarantor no duty of care concerning the advisability of a loan. The court said: "To relieve a guarantor of liability because a bank made a bad loan— absent a showing of fraud by the bank or collusion between bank and borrower— would be to stand guaranty law on its head.... The law of suretyship is not designed to protect guarantors from their own improvidence." 613 F.Supp. at 970– 71.

The Debtors are also principals of the borrower, so that from a practical viewpoint there is little to distinguish them from Rivers Edge with respect to First Mutual's obligations of care. Not surprisingly, borrowers have fared no better than guarantors under a negligence theory. In *Gries v. First Wisconsin National Bank of Milwaukee*, 82 Wis.2d 774, 264 N.W.2d 254 (1978), the borrowers' new business had failed. They sued the bank claiming that it gave them negligent business advice concerning the opening of their business and that it was negligent in loaning them the money. In affirming the trial court's dismissal after conclusion of the borrowers' case, the court stated that "[t]he theory advanced by the plaintiffs would impose upon the lender the function of actually

joining with them as an entrepreneur and thus assuming the risks fundamental to a new business." 264 N.W.2d at 257. The borrowers emphasized the evidence which they had offered indicating that the loan was poorly conceived, was opposed by the bank's main office, and was prompted by their desire to borrow for a limited business purpose until they were persuaded to adopt a more ambitious plan by a loan officer. The court replied:

> None of these observations by the plaintiffs can obscure the basic fact that it was the plaintiffs who borrowed the money to open a business. They called the bank; they prepared a proposal; they applied for the loan; they invested the money in the business. Although the failure of the business is unfortunate for both the plaintiffs and the bank, it was a risk which the plaintiffs assumed, and which can not be shifted to the bank.

264 N.W.2d at 257.

In *Wagner v. Benson*, 101 Cal.App.3d 27, 161 Cal.Rptr. 516 (4th Dist.1980), the plaintiffs, an orthodontist and his wife, made an unsuccessful investment in a cattle raising operation. In affirming dismissal of the negligence count, the California Court of Appeals stated:

> As to the negligence claim the Wagners allege they suffered substantial foreseeable harm from the Bank's negligence in loaning money to them, as inexperienced investors, for a risky venture over which the Bank exercised influence and control. However, the Bank owes no duty of care to the Wagners in approving their loan. Liability to a borrower for negligence arises only when the lender "actively participates" in the financed enterprise "beyond the domain of the usual money lender." Normal supervision of the enterprise by the lender for the protection of its security interest in loan collateral is not "active participation."

161 Cal.Rptr. at 521, and cases cited.

Borrowers have also been unsuccessful in charging lenders with negligent supervision of disbursements under a loan agreement. In *Thormahlen v. Citizens Savings*

*and Loan,* 73 Or.App. 230, 698 P.2d 512 (1985), the court held that a construction lender had no duty to use reasonable care to see that periodic loan disbursements did not exceed the specified percentages of construction costs.

In summary, the decisions are legion which deny a cause of action for negligent underwriting of a loan through loose internal lending standards or poor business judgments. *See e.g., Production Credit Ass'n of the Midlands v. Hanlon,* No. 87-249-A (D.Iowa June 14, 1990) (LEXIS, Genfed library, Dist. file); *The Federal Land Bank of Wichita v. Musgrove,* 796 P.2d 641 (Okla.Ct.App.1990); *Nelson v. Production Credit Ass'n of the Midlands,* 729 F.Supp. 677 (D.Neb.1989); *Bevier v. Production Credit Ass'n of Southeast Minnesota,* 429 N.W.2d 287 (Minn.Ct.App. 1988); *Production Credit Ass'n of Lancaster v. Croft,* 143 Wis.2d 746, 423 N.W.2d 544 (1988).

## VII. FIDUCIARY RELATIONSHIP

The Debtors attempt to fill the void in First Mutual's duty of care by contending that First Mutual had such a duty by reason of the existence of a fiduciary relationship with them. They allege in Count II of the proposed amended counterclaim that "[b]y restructuring, developing, and proposing to the [Debtors] the $12,-500,000 revolving loan, First Mutual undertook duties to the [Debtors] to ensure that the loan, as restructured, and the Project which was the subject matter of that loan, was financially and commercially viable and feasible"; that "[a]s a result of First Mutual proposing the restructured loan and taking an equity position in the Project, First Mutual became a joint venturer or partner with Rivers Edge and owed Rivers Edge the [Debtors] the fiduciary duties of utmost honesty, loyalty, good faith and full and fair disclosure"; and that it breached those fiduciary duties in failing to adhere to the conditions of its disbursement obligation, and in failing or refusing to disclose various facts pertaining to its investigation of the loan and its and Gerrity's relationship with McLay, and in failing

or refusing to work with the Debtors to resolve the problems which developed.

The Debtors take quite a different tack in the count for breach of fiduciary obligations contained in the current counterclaim. In the current counterclaim, the Debtors' allege that "[d]uring the entire period in which First Mutual funded construction, it assumed control of the Project." Specific allegations are made concerning First Mutual's selection of contractors and subcontractors, review of price quotes and drawings, participation in the selection of McWar as general contractor, and requirement that Rivers Edge hire two experts who would report to First Mutual. Under the proposed amendment, these allegations are gone without a trace. Neither version of the Debtors' fiduciary obligation claim, however, is of any substance.

It is well established that a fiduciary obligation is indeed owed by one joint venturer to another. *Mendelsohn v. Leather Mfg. Corp.,* 326 Mass. 226, 238, 93 N.E.2d 537, 541 (1950). *See also Epstein v. Stahl,* 1 Cal.Rptr. 143, 146, 176 Cal.App.2d 53 (1959). But First Mutual and the Debtors were not joint venturers. First, First Mutual had no "equity position" in the Albion Mills project. The property was entirely owned by Rivers Edge. Second, First Mutual's sole function was to make the loan. Under the terms of the November 9 Loan Agreement, First Mutual was entitled to a partial release fee of $1500 for each of the 200 residential condominium units when each was released from the Debtors' mortgage upon its sale by Rivers Edge; a total release fee of $300,000 was, in any event, due and payable in full at the maturity date of the Note. This right to the release fee does not constitute profit sharing, an indicia of a joint venture, as argued by the Debtors. Since the fee was deemed earned at the closing of the loan, it was due absolutely without regard to whether Rivers Edge operated at a profit or a loss.

Nor did First Mutual exercise, or have the right to exercise, a degree of control over the project which could conceivably place it in a fiduciary relationship

with the Debtors or Rivers Edge. All that the Debtors point to in this regard are actions normally undertaken by a construction lender—meeting with the consulting engineers, reviewing and approving construction plans, approving the construction manager, and reviewing requisitions to the extent necessary to justify a corresponding disbursement. That degree of control, which is normally incident to construction lending, does not make First Mutual a joint venturer. *Central Bank of Alabama, N.A. v. Gillespie*, 404 So.2d 35, 37 (Ala. 1981); *Edwards v. Northwestern Bank*, 39 N.C.App. 261, 250 S.E.2d 651, 661 (1979); *Gainsville Carpet Mart v. First Federal Savings & Loan Ass'n of Gainsville*, 121 Ga.App. 450, 174 S.E.2d 230, 233 (1970).

■ There are no other aspects of the relationship between First Mutual and the Debtors which would justify treating First Mutual as a fiduciary. One indicia of a fiduciary relationship is where a party places special trust and confidence in another who knowingly and voluntarily accepts the responsibility. *E.g., Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank Nat'l Assoc.*, 731 F.2d 112, 122 (2d Cir. 1984); *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235, 1243–44 (1982); *Rader v. Boyd*, 252 F.2d 585, 587 (10th Cir.1977); *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962). The Debtors placed no special trust and confidence in First Mutual and First Mutual accepted none.

A party owed a fiduciary obligation is often in a position of inequality, inferiority or other disadvantage. *E.g., Production Credit Ass'n of Lancaster v. Croft*, 143 Wis.2d 746, 423 N.W.2d 544, 547 (1988); *Baylor v. Jordan*, 445 So.2d 254, 256 (Ala. 1984); *Denison State Bank v. Madeira, supra; Gries v. First Wisconsin Nat'l Bank of Milwaukee*, 82 Wis.2d 774, 264 N.W.2d 254, 256 (1978). The Debtors were hardly in such a position. They were successful businessmen. They were versed in developing real estate. In their partner, McLay, they had in their service an individual whose profession was architectural design, who had substantial experience in construction management, and whose sole occupation was real estate development. They were represented by counsel. They had a financial advisor in their accountant, Elinor Reardon, and were represented by a mortgage broker, Spectrum. They had equal access to the same financial information provided to First Mutual—financial projections and construction cost estimates prepared by McLay, revised projections prepared by McLay and Spectrum, and appraisals and market data prepared by Schaeffer, Bates & Co. and a firm named Ralph T. Cullen Associates. Although the Debtors avow that they placed trust and confidence in First Mutual, they may not abandon all caution and responsibility for their own protection and unilaterally impose a fiduciary relationship. *Denison State Bank v. Maderia*, 230 Kan. 684, 640 P.2d 1235, 1244 (1982).

## VIII. CHAPTER 93A

■ The Debtors' final attempt to escape the inevitable need not detain us long. In the present counterclaim and in the proposed amended counterclaim, they allege that "[i]n connection with promising ["proposing" in the amendment] a construction loan for the Project, First Mutual has employed methods, acts or practices which are unfair, deceptive and in violation of Mass. Gen.L. ch. 93A ["as heretofore alleged" in the amendment]."

Mass.Gen.L. ch. 93A, § 11 (Law.Co-op. 1985 & Supp.1991) grants a businessman a cause of action against another businessman who has damaged him through the use in his business of "an unfair or deceptive act or practice." The cause of action need not arise from conduct which is otherwise actionable, but it must be within "at least the penumbra of some common-law, statutory, or other established concept of unfairness" or be conduct that is "immoral, unethical, oppressive, or unscrupulous." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App.Ct. 498, 504, 396 N.E.2d 149, 153 (1979). "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id.* As previously demonstrated, First Mutual's

conduct does not give rise to a cause of action under any traditional theory. Nor can it be regarded as falling within the "penumbra" of any such theory or as "immoral, unethical, oppressive or unscrupulous." *Id.*

## IX. CONCLUSION

First Mutual is entitled to summary judgment against the Debtors on its claim under the Guaranty and with respect to all counts of the Debtors' present counterclaim. The Debtors' motion for summary judgment is accordingly denied. I also deny the Debtors' motion for leave to file an amended and supplemental answer, counterclaim, crossclaim and jury demand because the amendment would be futile in that it too would fail to survive a motion for summary judgment. Finally, I allow FDIC's motion for leave to amend its reply to the Debtors counterclaim in which it asserts defenses under 12 U.S.C. § 1823(e), under *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and under the federal holder in due course doctrine. I will not further prolong this lengthy opinion with a discussion of these additional defenses. They are surplusage.

As of October 18, 1989, the day before the filing of the Debtors' chapter 11 petitions, the indebtedness stood at $14,085,-133.92, which is composed of $12,500.000 in principal, interest of $1,017,534.72, late charges of $80,965.20, costs of $186,634.00 and the release fee of $300,000. Because the debt was undersecured, no interest or costs accrued after the chapter 11 filings. 11 U.S.C. § 506(b). The subsequent foreclosure sale of $4,200,000 has reduced the indebtedness to $9,885,133.92.

Separate orders have issued allowing First Mutual an unsecured claim against the estate of each of the Debtors in the sum of $9,885,133.92, subject of course to the limitation that no more than $9,885,-133.92 is to be collected from all the estates. The parties are invited to review this computation and to file any appropriate motions under Rule 60 concerning the computation or any other matter.

## ORDER ALLOWING CLAIM

The court having today issued an opinion on cross motions for summary judgment in this adversary proceeding, it is

ORDERED and ADJUDGED, that the Plaintiff, Federal Deposit Insurance Corporation, as Liquidating Agent/Receiver for First Mutual Bank for Savings, has an allowed, unsecured claim against the estate of each of the above Debtors in the sum of $9,885,133.92. The claim assertable against each estate is subject to the limitation that no more than $9,885,133.92 shall be recovered with respect to all three claims.