[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10687

_____

D.C. Docket No. 9:17-cv-80203-RLR


TRIAXX PRIME CDO 2006-1, LTD.,
TRIAXX PRIME CDO 2006-2, LTD.,
TRIAXX PRIME CDO 2007-1, LTD.,
TRIAXX ASSET MANAGEMENT LLC,

                                        Plaintiffs - Appellants,


versus


OCWEN LOAN SERVICING, LLC,

                                        Defendant - Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 13, 2019)

Before JILL PRYOR, BRANCH and BOGGS,[*] Circuit Judges.

PER CURIAM:

In this appeal, we consider whether a borrower retains a contractual right to sue as the owner of a security after it has transferred the security to a trustee in order to secure a debt. Plaintiffs Triaxx Prime CDO 2006-1, Ltd.; Triaxx Prime CDO 2006-2, Ltd.; and Triaxx Prime CDO 2007-1, Ltd. (collectively, "Triaxx") acquired certificates, giving them an interest in certain mortgage-backed securities. Rather than holding the certificates, Triaxx created an investment vehicle by issuing notes to investors and transferring the certificates to an indenture trustee who held the certificates to secure the notes. Triaxx later sought to bring contract and tort claims as the owner of the certificates. We conclude that the district court properly dismissed these claims because when Triaxx transferred the certificates to the trustee, it retained no ownership interest that would give it a right to sue as the owner of the certificates. We thus affirm.

---

[*] Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

## I.    FACTUAL BACKGROUND[1]

### A.    Ocwen's Role as Mortgage Servicer

Triaxx acquired securities, known as certificates, giving it interests in several residential mortgage-backed securities trusts (the "RMBS Trusts"). Each RMBS Trust pooled together mortgage loans and issued certificates that entitled holders of the certificates to a share of the money generated when borrowers made payments on the mortgage loans held by the RMBS Trusts.

Beginning around 2013, defendant Ocwen Loan Servicing, LLC, acted as the servicer or master servicer for the mortgage loans in the RMBS Trusts.[2] For each RMBS Trust, the servicer and RMBS Trustee executed a written Pooling and Services Agreement ("PSA"), which set forth the standards the servicer had to follow. Under the PSAs, Ocwen is responsible for, among other things, collecting payments from borrowers, agreeing to modifications of mortgage terms when appropriate, handling foreclosures, and disposing of any properties that the RMBS Trusts acquire in foreclosure proceedings.[3] The PSAs limit Ocwen's liability to

---

[1] Because we write for the parties, we set out only the facts necessary to explain our decision.

[2] Ocwen was not the original servicer for the loans; it acquired the right to service them in 2012 or 2013.

[3] Triaxx acquired certificates issued by multiple RMBS Trusts. The PSAs for the various RMBS Trust are not identical, but for our purposes the differences are not material.

3

the RMBS Trusts or certificateholders to circumstances where Ocwen acted with gross negligence or worse.

Triaxx alleged that Ocwen was grossly negligent in failing to fulfill its duties under the PSAs by, among other things, agreeing to modifications of mortgage loans that excessively reduced loan balances, allowing loan delinquencies to continue without resolution for unreasonably long periods of time, and unsuccessfully attempting to foreclose on loans due to servicing or documentation deficiencies.  Triaxx asserted that this improper servicing resulted in booked losses of approximately $175 million and deprived it of returns that proper servicing would have generated.

## B.    Triaxx Created CDOs

This case is complicated by the fact that Triaxx did not simply hold the certificates.  After acquiring them, Triaxx issued collateralized debt obligations ("CDOs").  To create the CDOs, Triaxx sold pieces of the expected revenue from the certificates to investors in the form of debt:  promissory notes that Triaxx agreed to repay over time from the revenue generated by the certificates.

The certificates served as the collateral for the notes.  Instead of entering into a separate security agreement with each noteholder, Triaxx transferred the

4

certificates to an Indenture Trustee.[4]  In the Indenture Agreement, Triaxx granted

to the Indenture Trustee "all of its right, title and interest in" the certificates for the

life of the trust.  Doc. 42-5 at 8.[5]  Triaxx expressly agreed that it was transferring to

the Indenture Trustee "all rights, powers and options" regarding the certificates,

including the right "to bring Proceedings." *Id.* at 29.  And the Indenture Trustee

agreed to "hold" the certificates "in trust" for the purpose of securing the notes.  *Id.*

at 9.  The Indenture Trustee also agreed to make payments on behalf of Triaxx to

the noteholders.  The Indenture Agreement further specified that the notes are

"limited-recourse obligations . . . payable solely from the Collateral," that is, the

certificates, meaning that if the certificates fail to generate sufficient revenue to

repay the noteholders in full, Triaxx cannot be held liable for any shortfall.  *Id.* at

73-74.

Triaxx also entered into a Collateral Management Agreement ("CMA") with

the Collateral Manager, which is now Triaxx Asset Management ("TAM").  In the

---

[4] *See* Myron Kove et al., *Bogert's Trusts and Trustees* § 250 (June 2018) (explaining why a borrower who issues bonds to many bondholders generally creates a trust to hold the collateral for the benefit of bondholders as opposed to having a separate security interest run to each bondholder).

[5] In describing the creation of the CDOs, we rely on the text of the Indenture Agreement and the Collateral Management Agreement.  Although the plaintiffs did not attach these agreements to their complaint or amended complaint, they incorporated them by reference because the documents are central to the plaintiffs' claims, their contents were alleged in the amended complaint, and their contents are undisputed.  *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

Citations in the form "Doc. #" refer to the numbered entries on the district court docket.

CMA, Triaxx assigned to the Collateral Manager certain duties and functions that Triaxx was obligated to perform under the Indenture Agreement. Many of the CMA's provisions addressed the Collateral Manager's responsibilities for facilitating the acquisition of the certificates so that the CDOs could be issued. Under the CMA, the Collateral Manager also agreed to monitor the certificates and prepare reports about the certificates on behalf of Triaxx.

## C.    Procedural History

Triaxx sued Ocwen in federal district court for breach of contract, claiming that as a certificateholder it suffered material losses due to Ocwen's conduct as servicer or master servicer for the mortgages in the RMBS Trusts. Ocwen moved to dismiss the complaint for lack of subject-matter jurisdiction, arguing that Triaxx lacked standing because it had assigned the certificates to the Indenture Trustee. Triaxx opposed the motion, claiming that under the Indenture Agreement it retained the right as a certificateholder to sue. The motion was referred to a magistrate judge, who recommended that the district court grant the motion to dismiss for lack of subject-matter jurisdiction.

Triaxx objected to the recommendation. After *de novo* review, the district court adopted the magistrate judge's recommendation, granted Ocwen's motion, and dismissed the complaint without prejudice. The district court gave Triaxx two weeks to file an amended complaint or the case would be closed.

6

Triaxx timely filed an amended complaint.  TAM, the Collateral Manager, joined the case as a plaintiff.  In the amended complaint, Triaxx and TAM (the "plaintiffs") brought claims against Ocwen for breach of contract, as well as tort claims for breach of the duty to avoid conflicts of interest and to act with due care.

Ocwen moved to dismiss the amended complaint for lack of subject-matter jurisdiction on the ground that Triaxx lacked standing to pursue the breach-of-contract claim because it had transferred the certificates to the Indenture Trustee.  Ocwen also argued that TAM lacked standing to sue on the breach-of-contract claim because Triaxx never transferred to TAM any right to sue Ocwen.  Ocwen further asserted that both plaintiffs lacked standing to bring the tort claims because Triaxx no longer owned the certificates when Ocwen became the servicer.

The district court granted the motion to dismiss, concluding that the plaintiffs lacked standing to bring their claims.  The district court dismissed the claims with prejudice because the plaintiffs had been given a previous opportunity to amend and any further amendment would be futile.  The plaintiffs appealed.

## II.    STANDARD OF REVIEW

We review the district court's grant of a motion to dismiss *de novo*, "accepting the [factual] allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Mills v. Foremost Ins.*, 511 F.3d 1300, 1303 (11th Cir. 2008) (internal quotation marks omitted).

7

## III.   LEGAL ANALYSIS

The plaintiffs contend that the district court erred in dismissing their claims.[6] We disagree.  Below we explain why the district court properly dismissed Triaxx's breach-of-contract claim, TAM's breach-of-contract claim, and the plaintiffs' tort claims.

**A.**   **The District Court Properly Dismissed Triaxx's Breach-of-Contract Claim Because Triaxx Transferred to the Indenture Trustee Its Right as a Certificateholder to Sue Ocwen.**

With the breach-of-contract claim, Triaxx seeks to recover from Ocwen for losses that Triaxx claims it experienced as a certificateholder.  We accept that when Triaxx bought the certificates, it acquired a contractual right as a certificateholder to sue Ocwen for certain breaches of the PSAs.  The question we face here is whether Triaxx retained this contractual right after issuing the CDOs. Because the plain language of the Indenture Agreement establishes that Triaxx

---

[6] The district court dismissed the case for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), rather than failure to state a claim for relief under Rule 12(b)(6).  The central question on appeal is whether after executing the Indenture Agreement Triaxx retained a certificateholder's right to sue under the PSAs.  The parties characterize this issue as a jurisdictional one, whether Triaxx retained standing to sue.  But their arguments concern prudential standing, not jurisdiction.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) ("[T]he absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." (internal quotation marks omitted)).  Whether Triaxx retained a certificateholder's right to sue is really a question of whether it has a cause of action under the PSAs.  *See id.* at 129.  Likewise, whether Ocwen owed a duty to Triaxx is the key to whether Triaxx has a cause of action under tort law.  We thus review the district court's dismissal of the claims under Rule 12(b)(6) for failure to state a claim for relief.

8

conveyed the certificates to the Indenture Trustee, we conclude that Triaxx retained no right as a certificateholder to sue Ocwen under the PSAs. The district court therefore properly dismissed Triaxx's breach-of-contract claim.

Whether Triaxx retained a certificateholder's right to sue Ocwen under the PSAs turns on whether Triaxx transferred all its rights as a certificateholder to the Indenture Trustee. Under New York law,[7] if Triaxx made an unequivocal and complete assignment of the certificates to the Indenture Trustee, it would no longer have the right to sue Ocwen under the PSAs. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 125 (2d Cir. 1984) (explaining that under New York law "[a]n unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor"). To determine whether the assignment in the Indenture Agreement is complete and unequivocal, we look to the terms of the agreement, construing the agreement "in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). Of course, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (internal quotation marks omitted). Absent any ambiguity in the text of the agreement, "[e]vidence outside the four corners of the document as to what was really

---

[7] Neither party disputes that New York law governs the contract claims in this case.

9

intended" is inadmissible.  *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)."[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield*, 780 N.E.2d at 170.

In the Indenture Agreement, Triaxx effected an unequivocal and complete transfer of the certificates to the Indenture Trustee for the life of the trust.  The plain language of the Indenture Agreement clearly establishes that Triaxx transferred the certificates to the Indenture Trustee.  *See* Doc. 42-5 at 8 (stating that Triaxx "[g]rant[ed] to the [Indenture] Trustee . . . all of its right, title and interest in . . . the Collateral Debt Securities").[8]  Triaxx further agreed to "convey, assign, [and] transfer" the certificates to the trustee.  *Id.* at 29.  The Indenture Agreement expressly provided that, as part of this transfer, Triaxx was giving up any right as a certificateholder to sue.  *See id.* (explaining that this transfer included "all rights, powers and options (but none of the obligations) of [Triaxx] . . . including the . . . right . . . to bring Proceedings in the name of [Triaxx] . . . , and generally to do and receive anything that [Triaxx] is or may be entitled to do" with respect to the

---

[8] There is no dispute that the certificates are "Collateral Debt Securities."  Doc. 42-5 at 8. The Indenture Agreement defined this term to include "any Residential Mortgage-Backed Security."  *Id.* at 18.

10

certificates).  We thus conclude that Triaxx did not retain a certificateholder's right to sue Ocwen.

Triaxx argues that the assignment in the Indenture Agreement was incomplete and that it continues to be a certificateholder.  Triaxx points to language in the Indenture Agreement indicating that the Indenture Trustee would hold the certificates only for the life of the trust and that if the certificates generated sufficient revenue to satisfy the notes, the certificates would be returned to Triaxx.  We agree that Triaxx is a resulting beneficiary of the Indenture Trust, meaning it stands to receive the res of the trust if the notes are satisfied.[9]  But we cannot say that Triaxx's status as a potential beneficiary renders the transfer of the certificates to the Indenture Trustee "incomplete" such that Triaxx retained its right to sue as a certificateholder in light of the plain language that Triaxx "[g]rant[ed] to the [Indenture] Trustee . . . all of its right, title and interest in . . . the Collateral Debt Securities."  Doc. 42-5 at 8.[10]

---

[9] *See* Kove, *supra*, at § 250 (explaining that when a party gives property to a trust so that it may be held as collateral, the grantor "has no interest in the trust property, except that [he] is a resulting beneficiary if the res proves larger than necessary to satisfy the purposes of the trust").

[10] Triaxx also points—as evidence that the assignment was incomplete—to the fact that it issued junior notes.  But this fact reflects only that Triaxx was the resulting beneficiary that would receive the certificates if the senior notes held by the investors were satisfied.  We remain unconvinced that Triaxx's status as a resulting beneficiary rendered the transfer of the certificates incomplete during the life of the Indenture Trust.

The Second Circuit recently interpreted the same language in the Indenture Agreement to reach the same conclusion, holding that Triaxx did not retain a certificateholder's right to sue the RMBS Trustees under the PSAs. *See Triaxx Prime CDO 2006-1, Ltd. v. U.S. Bank N.A.* (*Triaxx III*), 741 F. App'x 857 (2d Cir. 2018) (mem.).[11]  In a separate lawsuit, Triaxx sued the RMBS Trustees in its capacity as a certificateholder, claiming that the RMBS Trustees breached their contractual duties set forth in the PSAs. *See Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon* (*Triaxx I*), No. 16-civ-1597, 2017 WL 1103033, at *2 (S.D.N.Y. Mar. 21, 2017).  The district court dismissed Triaxx's claims, concluding that through the Indenture Agreement Triaxx transferred the certificates and thus was no longer a certificateholder. *Id.* at *4; *see Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon* (*Triaxx II*), No. 16-civ-1597, 2018 WL 1417850, at *4 (S.D.N.Y. Mar. 8, 2018) (same).  Triaxx appealed to the Second Circuit, which affirmed the district court and expressly adopted the district court's reasoning. *See Triaxx III*, 741 F. App'x at 857.  Our ruling today interprets the same Indenture Agreement in the same way.[12]

---

[11] Ocwen has not argued that the Second Circuit's decision in *Triaxx III* is entitled to preclusive effect.  We thus do not address whether *Triaxx III* bars Triaxx in this case from litigating the issue of whether it continued to be a certificateholder after signing the Indenture Agreement.

[12] Our interpretation of the Indenture Agreement also is consistent with another recent Second Circuit decision that construed similar language in an indenture agreement. *Nat'l Credit Union Admin. Bd. v. U.S. Bank N.A.* (*NCUA*), 898 F.3d 243 (2d Cir. 2018).  In *NCUA*, a

Triaxx nonetheless argues that the Second Circuit's decision in *Aaron Ferer* establishes that the transfer in the Indenture Agreement was incomplete, meaning that Triaxx retained the right as a certificateholder to sue Ocwen. We disagree. In that case, Ferer-London, a metal trading company, sued Chase Bank to recover money that it alleged Chase received from a third party in the sale of copper that belonged to Ferer-London. 731 F.2d at 115, 119. Chase claimed that Ferer-London had no right to sue to collect the money because Ferer-London had assigned its interest in the copper to Williams & Glyn's, a London bank. *Id.* at 115, 125. Williams & Glyn's had previously loaned money to Ferer-London to finance the purchase of the copper, but Williams & Glyn's never filed a financing statement, security agreement, or other document to perfect a lien on the copper at the time it loaned the money. *Id.* at 116. When Ferer-London was unable to pay back the loan, Williams & Glyn's had Ferer-London execute an agreement

---

borrower that had owned certificates issued by RMBS trusts sued the RMBS trustees, claiming that the trustees had breached their duties by failing to address and correct problems with the underlying mortgage loans. *Id.* at 246-48, 250. After acquiring the certificates, the borrower used the certificates as collateral to secure notes and transferred the certificates to an indenture trustee who held the certificates for benefit of the noteholders. *Id.* at 248. The Second Circuit affirmed the dismissal of the borrower's claims against the RMBS trustees, concluding that it had not retained a certificateholder's right to sue because the indenture agreement effected a "complete transfer" of the certificates to the indenture trustee, who held the "RMBS Trust certificates and any claims based on those certificates" and would "continue to hold the claims until the [notes were] satisfied." *Id.* at 253. Because the indenture trustee "currently possesse[d] the claims," the Second Circuit concluded that the borrower could not bring claims belonging to a certificateholder. *Id.* at 253-54.

13

assigning "all [of Ferer-London's] rights and interests" in the copper to Williams & Glyn's. *Id.* at 117, 125.

Despite the broad language assigning Ferer-London's rights to Williams & Glyn's, the Second Circuit concluded that Ferer-London retained the right to sue Chase, in essence deciding that the agreement with Williams & Glyn's did not effect a complete assignment of all Ferer-London's rights in the copper. *See id.* at 125. The Second Circuit explained that the assignment was "more in the nature of an assignment as security for an antecedent debt [Ferer-London] owed to the assignee, Williams & Glyn's" and that "[i]n such circumstance"—that is, when a party gives an assignment to secure an already existing debt—New York law recognizes that the assignor retains the right "to sue. . . in order to enforce its rights and ensure that the assignee prosecutes the cause vigorously." *Id.*

We do not read the Second Circuit's decision to mean that any assignment given to secure a debt is incomplete. The Second Circuit explained that Ferer-London retained the right to sue because Ferer-London's assignment was created to secure an *antecedent* debt. *Id.* The Second Circuit's focus on the nature of the debt the assignment secured implies, though it does not specify, that if the assignment had been given to secure a *contemporaneous* or *future* debt, Ferer-London would not have retained the right to sue.

14

Triaxx urges us to extend the reasoning in *Aaron Ferer* to apply even when the assignment is not for an antecedent debt.  It contends that in all cases the borrower who gives the security interest must retain the right to sue to protect the collateral and ensure that it will generate the revenue necessary to satisfy the debt.  But we find this reasoning unpersuasive in this case, where the notes were limited-recourse obligations, meaning Triaxx could not be held personally liable if the certificates failed to generate sufficient revenue to repay the notes.  We thus join other courts in concluding that *Aaron Ferer*'s reasoning does not extend beyond the circumstances when an assignment was "made to cover preexisting debts owed to the assignee."  *House of Europe Funding I Ltd. v. Wells Fargo Bank, N.A.*, No. 13-cv-519, 2015 WL 1472301, at *7 (S.D.N.Y. Mar. 30, 2015); *see Clarex Ltd. v. Natixis Secs. Am. LLC*, No. 12-civ-722, 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) (same); *RBS Holdings, Inc. v. Gordon & Ferguson, Inc.*, No. 06-civ-6404, 2008 WL 782616, at *2-3 (S.D.N.Y. Mar. 26, 2008) (same).[13]

Triaxx argues that other provisions in the Indenture Agreement and CMA show that it retained the right as a certificateholder to sue.  Its arguments fail to convince us.

---

[13] It is true that one district court has read *Aaron Ferer* more broadly and applied its reasoning to an assignment given for a contemporaneous debt; however, that court did not consider the distinction between an antecedent debt and a contemporaneous or future debt. *See Safeco Ins. Co. of Am. v. M.E.S., Inc.*, Nos. 09-cv-3312, 10-cv-2798, 2017 WL 1194730, at *31 (E.D.N.Y. Mar. 30, 2017).  We therefore are unpersuaded by that court's reasoning.

15

First, Triaxx points to Section 7.5 of the Indenture Agreement, which obligates Triaxx to file financing statements, to take action as necessary "to secure the rights and remedies of the Secured Parties," and to "enforce any of the Pledged Securities." Doc. 42-5 at 110. Triaxx claims that the authority to "enforce any of the Pledged Securities" shows that it retains the right to sue Ocwen.

When Section 7.5 is read in context, this argument falls apart. *See Aimco Chelsea Land, LLC v. Bassey*, 773 N.Y.S.2d 908, 909 (N.Y. App. Div. 2004) ("[S]ingle clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." (internal quotation marks omitted)). The remainder of Section 7.5 identifies the steps Triaxx must take to perfect and maintain the noteholders' security interests. Read in context and consistent with the rest of Section 7.5, the reference to Triaxx's enforcement of the pledged securities means that it must defend challenges to the preference and priority of the noteholders' security interest in the collateral. We do not read this language as giving Triaxx the right to bring claims, like the ones here against Ocwen, that seek to defend the value of the collateral itself.[14]

---

[14] Triaxx also argues that two other provisions in the Indenture Agreement demonstrate that it retains the certificateholder's right to sue. First, it points to Section 7.8 of the Indenture Agreement, which contains "Negative Covenants" that prohibit Triaxx from taking certain actions. Doc. 42-5 at 112. Section 7.8(b) states that "[n]either [Triaxx] nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral . . . except . . . as expressly permitted by

Triaxx also contends that the terms of the CMA show that it retains the certificateholder's right to sue.  We may consider the content of the CMA—to which Ocwen is not a party—to understand the scope of the Indenture Agreement because the CMA was executed at the same time as and referenced in the Indenture Agreement.  *See This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (explaining that under New York law "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together" (internal quotation marks omitted)).  The problem for Triaxx is that nothing in the CMA supports Triaxx's argument.

Section 2 of the CMA identifies the Collateral Manager's general duties, which pertain to identifying, retaining, and selling the collateral.  Triaxx relies on catchall language at the end of this provision stating:

---

this Indenture and the Collateral Management Agreement."  *Id.* at 114.  Triaxx argues that this provision reflects an understanding that it retains the right to sell, transfer, enforce, or otherwise act on the collateral.  But we understand Section 7.8, when viewed in light of the entire Indenture Agreement, as simply making clear that the Indenture Trustee and Triaxx may take no action regarding the certificates except as expressly permitted under the Indenture Agreement or CMA.  Because the remainder of the Indenture Agreement is clear that Triaxx retains no interest in the certificates during the period when the Indenture Trustee holds them, we reject Triaxx's argument.

Second, Triaxx relies on Section 12.1(a)(v) of the Indenture Agreement, which permits it to sell a certificate that is not in default if the sale proceeds are immediately reinvested in a substitute security or paid to the noteholders.  It contends that this provision shows it retains broad interests in the collateral, including the right to sell the certificates.  We disagree with this interpretation.  Under the Indenture Agreement, Triaxx may sell the certificates only during the "Reinvestment Period," a limited time period shortly after the CDOs were issued.  *Id.* at 49-50, 161.  The plain language of the Indenture Agreement does not support Triaxx's claim that it retains the right to sell the certificates throughout the life of the CDOs.

17

> The Collateral Manager shall, subject to and in accordance with the Indenture . . . exercise any other rights or remedies with respect to [the certificates] as provided in the Underlying Instruments or take any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be in the best interests of the Noteholders.

Doc. 42-2 at 5.  Although the terms of this provision appear to be expansive, the provision states that the Collateral Manager must act "in accordance with the Indenture."  *Id.*  Because Triaxx may not under the terms of the Indenture Agreement bring a lawsuit against Ocwen, this provision cannot have transferred the right to sue to the Collateral Manager.

After considering the Indenture Agreement and CMA as a whole and in context, we conclude that after executing the Indenture Agreement, Triaxx was no longer a certificateholder.  Thus, the district court properly dismissed its breach of contract claims against Ocwen.

**B.    The District Court Property Dismissed TAM's Breach-of-Contract Claim Because Triaxx Never Transferred to TAM the Certificateholder's Right to Sue Ocwen.**

TAM contends that the district court erred in dismissing its breach-of-contract claim because, it asserts, in the CMA Triaxx transferred to it the right to sue under the PSAs.  TAM's argument rests on the premise that after issuing the CDOs, Triaxx retained a certificateholder's right to sue Ocwen such that this right could be transferred to TAM.  This claim must be dismissed for the same reason as Triaxx's breach-of-contract claim:  after transferring the certificates to the

18

Indenture Trustee, Triaxx was no longer a certificateholder and thus had no right to sue.[15]  Because TAM never acquired the right to sue, the district court properly dismissed TAM's breach-of-contract claim.

## C.     The District Court Properly Dismissed the Plaintiffs' Tort Claims Because Their Allegations Were Insufficient to Establish that Ocwen Owed Them a Duty.

In their amended complaint, the plaintiffs also asserted tort claims against Ocwen, alleging that it breached duties to avoid conflicts of interest and act with due care.  We conclude that the district court properly dismissed the tort claims because the plaintiffs' allegations are insufficient to establish that Ocwen owed them a duty.

Under New York law,[16] to sustain a claim for negligence, the plaintiffs must show that (1) Ocwen owed them a cognizable duty of care; (2) Ocwen breached that duty; and (3) the plaintiffs suffered damage as a proximate result of the breach. *See Di Benedetto v. Pan Am World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004).

---

[15] TAM also contends that it could sue Ocwen as the Indenture Trustee's agent.  TAM points to a provision in the CMA that appoints TAM as the "Issuer's true and lawful agent and attorney-in-fact."  Doc. 42-2 at 7.  The term "Issuer" is defined to include Triaxx "together with its successors and assigns."  *Id.* at 2.  TAM contends that because the Indenture Trustee is Triaxx's assignee, TAM has been appointed as the Indenture Trustee's agent.  We reject this interpretation, which reads isolated provisions of the CMA out of context and is inconsistent with the CMA when read as a whole.  *See Aimco Chelsea Land,* 773 N.Y.S.2d at 909 (explaining that clauses of contracts must be read in context).  We see no indication in the CMA or the Indenture Agreement that the parties intended for the Collateral Manager to be able to bring a lawsuit on behalf of the Indenture Trustee.

[16] The parties agree that New York law governs the tort claims.

19

"Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." *Espinal v. Melville Snow Contractors, Inc.*, 773 N.E.2d 485, 487 (N.Y. 2002).

We assume for purposes of this appeal that under New York law Ocwen owed the certificateholders extra-contractual duties to avoid conflicts of interest and to act with due care. *See AG Capital Funding Partners, L.P. v. State St. Bank & Tr. Co.*, 896 N.E.2d 61, 66-67 (N.Y. 2008). While Triaxx possessed the certificates, Ocwen would have owed it these duties. But when Triaxx issued the CDOs and transferred its "right, title and interest in" the certificates to the Indenture Trustee, Doc. 42-5 at 8, Ocwen owed the duties to avoid conflicts of interest and to act with due care to the Indenture Trustee, not Triaxx or TAM. The claims in this case relate exclusively to the time period *after* the CDOs were issued because the plaintiffs allege that Ocwen's improper activities began in 2013 when it took over as servicer or master servicer of the mortgages, which was years after the CDOs issued. Because the allegations here are insufficient to establish that Ocwen owed Triaxx a duty, the district court properly dismissed the tort claims.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.

**AFFIRMED.**

20